STATE v. JOHN WILLIAM FORICHETTE,
ALSO KNOWN AS JOHN EDWARD FORICHETTE.

156 N. W. (2d) 93.

January 5, 1968—No. 40,035.

■

*James S. Bullock,* Minnesota Affiliate, American Civil Liberties Union, *Joseph Perry,* and *Lynn S. Castner,* Executive Director and Counsel, Minnesota Affiliate, American Civil Liberties Union, for appellant.

*Douglas M. Head,* Attorney General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* and *David Weinberg,* Assistant County Attorneys, for respondent.

SHERAN, JUSTICE.

Appeal from a district court judgment of conviction for the crime of perjury.

The principal issue raised by the appeal is whether one charged with the crime of perjury in this state can be found guilty where the false testimony was given in proceedings which were initiated because of a regulation which could have been successfully attacked directly as an encroachment upon personal liberties protected by the Federal and State Constitutions. In addition we have for consideration the question of whether defendant was denied a fair trial because:

(a) Reports made by the state's key witnesses to the Federal Bureau of Investigation with respect to matters covered by their direct testimony were not made available to defendant for purposes of cross-examination.

(b) The trial court failed to instruct the jury as requested by defendant on matters deemed relevant to the alleged falsity of the testimony in question.

(c) The cross-examination of one of the state's witnesses was limited.

(d) The attorney for the state in final argument read a statement from an unidentified newspaper or magazine.

The Civil Service Commission of the city of Minneapolis, authorized by the charter of that city (c. 19, § 7) to adopt rules respecting persons eligible for employment by the city of Minneapolis, promulgated Civil Service Commission Rules 4.06(j) and 12.02(q) now under attack.

Rule 4.06(j) provides:

"The Civil Service Commission may refuse to examine an applicant, or, after examination may remove from the eligible list, or refuse to certify any eligible who:

\* \* \* \* \*

"(j) Is a member in any society, club, or group advocating or supporting Naziism, Communism, Anarchism, Fascism, or any similar society, club, or group having for its purpose the overthrow of the existing form of government of the United States by force or violence; or who openly advocates or supports any of the subversive doctrines or prin-

ciples for which the foregoing societies, clubs, or groups may stand; or who is in any manner disloyal to the government of the United States."

Rule 12.02(q) provides:

"The following shall be sufficient cause for removal:

\* \* \* \* \*

"(q) Is a member in any society, club, or group advocating or supporting Naziism, Communism, Anarchism, Fascism, or any similar society, club, or group having for its purpose the overthrow of the existing form of government of the United States by force or violence; or who openly advocates or supports any of the subversive doctrines or principles for which the above societies, clubs, or groups may stand; or who is in any other manner disloyal to the government of the United States."

On July 9, 1964, proceedings were instituted to effect the discharge of John William Forichette, employed by the city of Minneapolis as an engineering aide from June 1, 1960, to July 8, 1964, upon the ground that he had, in violation of the regulations quoted, fraudulently obtained employment with the city by intentionally and falsely stating in applications for examination-dated March 14, 1960, December 11, 1961, and June 8, 1962, that he was not a member of any political party or organization which advocates the overthrow of our constitutional form of government in the United States. Defendant denied under oath the testimony of the witnesses produced in support of the charges that during the period in question Mr. Forichette was a dues-paying member of the North Side Club of the Communist Party and that he served as treasurer.

On May 4, 1965, the Hennepin County grand jury indicted defendant on the basis of this testimony for the crime of perjury in violation of Minn. St. 609.48, subd. 1(1), which provides:

"Whoever makes a false material statement which he does not believe to be true in any of the following cases is guilty of perjury and may be sentenced as provided in subdivision 4:

"(1) In or for an action, hearing or proceeding of any kind in which the statement is required or authorized by law to be made under oath or affirmation."

On June 18, 1965, defendant was found guilty of the crime charged by verdict of the jury to which the case was submitted. Defendant was sentenced on July 21, 1965, for a term of 2 years with execution stayed upon condition that he serve the first 6 months in the Minneapolis Workhouse. This appeal from the judgment of conviction was promptly taken.

■ Defendant argues that the conviction cannot stand because Rules 4.06(j) and 12.02(q) are constitutionally forbidden bills of attainder; are so vague as to deny defendant his right of due process of law guaranteed under U. S. Const. Amends. V and XIV and Minn. Const. art. 1, §§ 2 and 7; are infringements upon the freedoms of speech, press, and association guaranteed by U. S. Const. Amends. I and XIV and Minn. Const. art. 1, § 3; and are in conflict with Minneapolis City Charter, c. 19, § 13, which forbids questions in any examination of persons seeking civil service employment by the city of Minneapolis which "relate to the political or religious convictions or affiliations of the applicant."

If we were dealing here with a direct attack upon Rules 4.06(j) and 12.02(q), (as in a declaratory judgment proceeding, for example), it is possible that these rules would be held inconsistent with the quoted provision of c. 19, § 13, of the Minneapolis charter and violative of constitutional guarantees as interpreted in such decisions of the United States Supreme Court as United States v. Robel, 389 U. S. 258, 88 S. Ct. 419, 19 L. ed. (2d) 508; Whitehill v. Elkins, 389 U. S. 389, 88 S. Ct. 184, 19 L. ed. (2d) 228; Keyishian v. Board of Regents, 385 U. S. 589, 87 S. Ct. 675, 17 L. ed. (2d) 629; United States v. Brown, 381 U. S. 437, 85 S. Ct. 1707, 14 L. ed. (2d) 484; Aptheker v. Secretary of State, 378 U. S. 500, 84 S. Ct. 1659, 12 L. ed. (2d) 992; Baggett v. Bullitt, 377 U. S. 360, 84 S. Ct. 1316, 12 L. ed. (2d) 377; Cramp v. Board of Public Instruction, 368 U. S. 278, 82 S. Ct. 275, 7 L. ed. (2d) 285; Smith v. California, 361 U. S. 147, 80 S. Ct. 215, 4 L. ed. (2d) 205; United States v. Lovett, 328 U. S. 303, 66 S. Ct. 1073, 90 L. ed. 1252; and Schneiderman v. United States, 320 U. S. 118, 63 S. Ct. 1333, 87 L. ed. 1796. Cf. American Communications Assn. v. Douds, 339 U. S. 382, 70 S. Ct. 674, 94 L. ed. 925.

But, under the laws of Minnesota, it is no defense to a charge of perjury before a tribunal having jurisdiction of the subject matter and the

person that the law giving rise to the proceedings in which the false testimony was given could have been successfully attacked upon the grounds of invalidity. In State v. Mandehr, 168 Minn. 139, 209 N. W. 750, the defendants, convicted of the crime of perjury, argued that an essential element of the offense was lacking because the false testimony was given during the prosecution of the defendants for a violation of an ordinance of the city of St. Paul prohibiting a person in an intoxicated condition from driving a motor vehicle, which ordinance under state laws then in force was invalid as an intrusion upon an area of regulation preempted by state legislation. Counsel for defendants contended that since the ordinance upon which the prosecution was based was invalid, the false testimony was not criminal because perjury cannot be committed in the trial of a person charged with a violation of an invalid ordinance. In affirming the conviction, we said (168 Minn. 145, 209 N. W. 752):

"There was no usurpation of judicial power. The municipal court has jurisdiction of prosecutions for violations of ordinances of the city of St. Paul. It had jurisdiction over Mandehr's person and over the subject matter of the litigation. The rule upon which appellants' counsel rely is not applicable. In giving the false testimony the appellants committed the crime of perjury, notwithstanding the fact that the ordinance had been annulled by the statute."

The Federal rule appears to be in accord. See, United States v. Williams, 341 U. S. 58, 71 S. Ct. 595, 95 L. ed. 747; United States v. Remington (2 Cir.) 208 F. (2d) 567; United States v. Parker (7 Cir.) 244 F. (2d) 943; United States v. Ponti (E. D. Pa.) 257 F. Supp. 925; Dennis v. United States, 384 U. S. 855, 86 S. Ct. 1840, 16 L. ed. (2d) 973.

Since defendant undertook to respond to questions addressed to him in quasi-judicial proceedings which the Civil Service Commission was empowered to conduct, the false testimony which the jury found defendant gave cannot be excused now upon the ground that if properly advised he would not have answered these questions in the first place. Defendant is not being punished because of his membership in the North Side Club of the Communist Party. The offense with which he was charged and of which he has been found guilty is that, sworn to tell the truth in pro-

ceedings within Civil Service Commission jurisdiction, he made statements which the jury has found to have been knowingly false. We are not aware of any legal doctrine which suggests that a person may justify perjury as a necessary means for the advancement of personal liberty.

■ Although no effective motion for a new trial was made, we will consider defendant's claim of prejudicial rulings at trial, there being constitutional grounds for the assertions of error.

■ The key witnesses for the prosecution gave testimony from which the jury could have found that defendant was a dues-paying member and officer of the North Side Club, the denial of which by defendant in the proceedings before the Civil Service Commission constituted the perjury for which he was indicted and convicted in the district court. These witnesses testified that they made regular reports of their activities in the North Side Club to the F. B. I. and turned over to it receipts for dues paid by them. Some of these receipts were received in evidence against defendant in this trial. Defendant served a subpoena upon the F. B. I. to produce all written reports made by these witnesses and all memoranda made by them, together with all records of sums paid to them by the Bureau. A special agent of the F. B. I. appeared in response to the subpoena and, acting upon advice of the United States District Attorney, claimed privilege with respect to these reports and records, refusing to answer all questions put to him other than his name and whether he was acquainted with the state's witnesses. Defendant then moved to strike the testimony of the witnesses who had made the reports upon the ground that the failure to produce them resulted in an unconstitutional curtailment of his right to cross-examine. The motion was denied.

Subsequent to the trial of this case, our decisions in State v. Thompson, 273 Minn. 1, 139 N. W. (2d) 490, certiorari denied, 385 U. S. 817, 87 S. Ct. 39, 17 L. ed. (2d) 56, and State v. Grunau, 273 Minn. 315, 141 N. W. (2d) 815, were filed. The operative effect of these decisions may include the present case because the judgment herein had not become final by expiration of the time for appeal. It is clear that if the reports demanded were in the possession of the prosecuting authorities for the state or of police officers employed by the state or its gov-

ernmental subdivisions, production of the reports would have been imperative as written statements made by a witness and signed or otherwise approved and adopted by him. It is clear, too, that if this were a prosecution for perjury in the Federal courts and the testimony of these witnesses were tendered in support of a claimed violation of a Federal criminal law, the reports to the F. B. I. would be producible under the rule of Jencks v. United States, 353 U. S. 657, 77 S. Ct. 1007, 1 L. ed. (2d) 1103.

There are two state cases which have dealt with this problem. In Commonwealth v. Smith, 417 Pa. 321, 208 A. (2d) 219, it was held error for the trial court to have refused to issue a subpoena in an effort to secure reports in the hands of the F. B. I. made by witnesses in state criminal proceedings. The case is not strictly in point because here a subpoena was issued. But this language of that court makes distinction upon this ground of doubtful validity (417 Pa. 332, 208 A. [2d] 225):

"* * * [I]t can only be a paradox beyond compare to say that, because this case adds up the guarantees of both Federal and State governments, that the total is less than the individual parts; that while Smith would be allowed federal documents in a federal court and state documents in a state court, he cannot, with both the Federal and State governments looking on, obtain a federal document to use in a state court, where his basic constitutional rights, both Federal and State, are involved."

On the other hand, in People v. Parham, 60 Cal. (2d) 378, 33 Cal. Rptr. 497, 384 P. (2d) 1001, the refusal of a state trial court to strike the testimony of witnesses who had given statements to the F. B. I. which were not produced upon demand by the defendant was held not to be error.

The difficulty in the present case comes from the fact that the agent of the F. B. I. who refused to produce the demanded reports and records did so because of restraints imposed by Federal law forbidding disclosure of national security files without approval of the Attorney General. In an effort to meet the impasse thus created, the court inquired as to whether defendant would join in a request by the United States District

Attorney to stay the proceedings "so that he may get in touch with the Attorney General for the purpose of granting permission to divulge the records that are subpoenaed." The attorney for the defendant declined to do so. Nevertheless, the court, concerned about the problem with which he was confronted, made this statement:

"* * * See if we can't * * * let the defendant examine these records. Then, if not, let the Court examine them in camera and I can assure you that I will not permit anything to go before the public that will injure the United States Government or the F. B. I. in its work in enforcing the law. But if there is something in there that is absolutely impeachable, I think in justice to the other side that it should be brought out. Now, how long an additional time would you want?

* * * * *

"MR. NORDIN [Assistant United States District Attorney in Minnesota]: I have been instructed to request forty-eight hours, your Honor, * * *.

* * * * *

"MR. GOULETT [prosecuting attorney]: I gather the defense objects to this continuance?

"MR. CASTNER [defendant's counsel]: That is correct.

* * * * *

"THE COURT: If the defendant will join in with that request, I will grant it. If they do not, * * * I will not compel them to present this evidence. In other words, I do not want to hold the F. B. I. guilty of contempt of court on something that they are powerless to prevent at this time because of the orders of the Attorney General of the United States * * *."

Although the record indicates that one of the attorneys for the defense requested a "few minutes recess to discuss this," there was no joinder by the attorneys for defendant in a request that the proceedings be stayed for 48 hours to permit reference of the problem to the Attorney General of the United States in an attempt to secure permission for release of the subpoenaed information.

The problem posed is a troublesome one. We agree with the trial

court that, generally at least, an employee of the Federal government subpoenaed to testify in a state court should not be punished for contempt if his refusal to testify is based upon binding orders of officers of the Federal government for which he is acting. But this does not answer the question of whether the testimony of the witnesses presented by the state should have been stricken from the record with instructions to the jury to disregard it.

In some cases, even this procedure would be unsatisfactory for the obvious reason that testimony once heard cannot be fully erased by judicial admonition. The dangers to be anticipated would suggest the desirability of pretrial arrangements by the attorneys for the state and for the defendant on the one hand, and Federal authorities on the other, for the release of reports and statements of the kind here involved for presentation to the state court for examination upon demand of the attorney for the defendant made at the close of direct examination of the witness called by the state to prove its case.

As to the matter before us, we have concluded, with some misgivings, that prejudicial error has not been made to appear because defendant, given the opportunity to secure the desired statements by consenting to a 48-hour stay of the proceedings, failed to do so. There is nothing in the record to indicate that this stay would have caused irreparable harm to the case of defendant and, although no assurance was given that the requested statements and records would be produced if the stay was granted by consent of the parties, we do not feel that this conviction should be reversed when the possibilities of securing the requested materials were not fully exhausted by defendant.

■ Defendant contends that the following requested instructions should have been given:

"IX

"Members of the Jury, I charge you as a Matter of Law that to find the Defendant guilty, you must find that he was a Member of the Communist Party.

"X

"I instruct you that mere membership in the Communist Party is not enough.

## "XI

"You must find that he openly advocated and supported the overthrow of the existing form of Government by force and violence.

## "XII

"You must find that by acts and conduct the Defendant demonstrated that he openly advocated and supported the overthrow of our Government by force and violence.

## "XIII

"I charge you as a Matter of Law that reading and distribution of literature is not of itself conduct which demonstrates membership in the Communist Party.

## "XIV

"To find the Defendant guilty you must find that at the time the testimony of the Defendant contained in the indictment was made he had knowledge of his Membership in the Communist Party as the Law has defined such membership."

In Killian v. United States, 368 U. S. 231, 248, 82 S. Ct. 302, 311, 7 L. ed. (2d) 256, 267, the United States Supreme Court refers to the following criteria as being usable in determining whether or not a person is a member of the Communist Party:

"1.    Paid dues or made any financial contributions to the Communist Party or collected any funds on its behalf;

"2.    Attended Communist Party meetings, classes, conferences, or any other type of Communist Party gathering;

"3.    Had made himself subject to the discipline of the Communist Party in any form whatsoever;

"4.    Participated in any recruiting activities on behalf of the Communist Party;

"5.    Has executed orders, plans or directives of any kind of the Communist Party;

"6.    Has acted as an agent, messenger, correspondent, organizer, or in any other capacity in behalf of the Communist Party;

"7.    Has been accepted to his knowledge as an officer or member of the Communist Party, or as one to be called upon for services by other officers or members of the Communist Party;

"8. Has conferred with officers or other members of the Communist Party in behalf of any plan or enterprise of the Communist Party;

"9. Has spoken or in any other way communicated orders, directives or plans of the Communist Party;

"10. Has advised, counseled, or in any other way imparted information, suggestions, or recommendations, to officers or members of the Communist Party, or to anyone else, in behalf of the Communist Party;

"11. Has indicated by word, action, conduct, writing, or in any other way, a willingness to carry out in any manner and to any degree the plans, objectives or designs of the Communist Party;

"12. Has in any other way participated in the activities, planning or actions of the Communist Party."

We do not believe that the variance between the instructions given and the instructions requested would warrant a new trial under the circumstances of this case. In the proceedings before the Civil Service Commission defendant was asked whether he was a dues-paying member or officer of the North Side Club of the Communist Party. He denied it. There was ample testimony to support the proposition that this testimony was false. Defendant was not questioned as to whether he advocated or supported the overthrow of the existing form of government by force and violence, and the question of whether he committed perjury in this respect was not in the case. The charge of perjury did not involve a denial by defendant that he read Communist Party literature, so there was no need to give the requested instruction No. 13. The failure to give requested instruction No. 14 was not error in light of the court's instruction to the effect that the state was obligated to show that false answers, if any, given by defendant in the hearing before the Civil Service Commission were given "knowingly and willingly." The criteria of membership set out in Killian v. United States, *supra*, were not fully incorporated in the charge, but the essential tests in so far as applicable to the facts of this case were included in the charge as given.

■■■ Defendant argues that his cross-examination of a witness called by the state was unduly restricted. We have examined the cross-examination as it appears reported in the transcript covering approximately 40 pages and we are satisfied that defendant's attorney was not unduly

restricted by any rulings of the trial court with respect to the scope of his inquiry.

During the course of his final argument, the attorney for the state, apparently anticipating that two of the state's witnesses would be attacked as incredible informers, said:

"A U. S. Congressman, some time back, had occasion to speak of what an American citizen had done in a similar capacity to that of Miss * * * and Mr. * * *. I think his words are much better put than I could and I would like to read a little bit of that to you.

" 'The great majority of citizens of this nation, and of those in this hearing room, are fully devoted to this country and the principles on which it is founded. Most of us in some way giving something of ourselves to our country. A few give more than others. You are one of those few. You could have gone about your way as some of us do, concerning yourselves largely with earning a comfortable living, carrying out your basic citizenship duties and spending your spare time in relaxation and leisure of one kind or another. In the interest of our nation's security, you were asked to give up this formal pursuit of happiness which is a right of every American citizen. You were asked to give it up for an unpleasant, time-consuming job, a job involving self-sacrifice and danger and possible public disgrace and contempt. A job made necessary by the fact that there are those who would destroy our government and rob the American people of their rights, freedom and liberties. You could have said "no," to the request as some others have done. It is to your everlasting credit that you said "yes." By doing so, you proved your willingness to give to and for your country, and your neighbors, including those who would not understand the true significance of your act, and would condemn you for it. I know that like others who have made the same sacrifice, you have already been called names. The name "informer" has been hurled at you and will be hurled at you in the future by the unthinking, the ignorant, and the evil. You, I feel sure, have the intelligence and strength of character not to be swayed or dismayed by them. These name-callers, by their actions, prove only their inferiority to you no matter what their station in life may be.

" 'Therefore, speaking not only for myself, but for the Committee

and the great majority of the American people, I am sure I can congratulate you for the job that you have done so well, for the sacrifices you have made for your country and your fellow man. For these things you will always have the appreciation and gratitude of this Committee, of the Congress, and as I said, at least the majority—a large majority of the American public.' "

There was no adequate reason for this reference to out-of-court assertions by an unidentified Congressman at an unspecified occasion, presumably reported in an unnamed journal. However, no exception was made at the conclusion of the argument and there was no request that the trial court instruct the jury to disregard it. The course defendant's attorney chose instead was to characterize the witnesses as paid informers and liken them to "a man named Judas" who "threw the money back" and "hung himself." The result was abandonment of the right to complain in this court about the anticipatory argument made by the state.

Among the exhibits produced in evidence were receipts for dues, which receipts were claimed by a state's witness to have been received from Mr. Forichette. The matter of whether Mr. Forichette actually wrote these receipts became relevant on the issue of whether his Civil Service Commission testimony that he was never a treasurer of the North Side Club of the Communist Party was or was not false. In corroboration of the witness, the state produced a handwriting expert who testified that from comparison of the receipts with certain proved samples of defendant's handwriting he was of the opinion that the receipts were written by defendant. One of these samples was state's exhibit O, an arrest record of the Duluth, Minnesota, police department containing a quantity of handwriting by defendant. Early in the trial, out of hearing of the jury, the state's attorney explained that this exhibit was a document on which the state's expert witness had relied in making the comparisons described. Before state's exhibit O was offered in evidence, this statement was made by the prosecuting attorney:

"* * * [O]ur sole purpose * * * is to show that the handwriting on this arrest card is that of the defendant Forichette.

"Now, I have no desire that the Jury should ever hear that the defendant, John Forichette, was ever arrested for anything, and if there is any way that counsel will agree to either stipulate that this is a card in his handwriting, and if not, at least cut that off or cover over everything on the card so that nobody can tell it is from a police department so I have no way of getting it in."

In spite of this offer made at an early stage of the trial, the attorney for defendant preferred not to make the stipulation suggested, and the state proceeded to call as a witness one Robert Olbin of the Duluth Police Department who identified state's exhibit O as containing handwriting of defendant. The exhibit was offered in evidence.

The trial court in his instructions to the jury in an attempt to avoid the prejudicial effect of the testimony adduced in support of the foundation for receipt of state's tendered exhibit O, said:

"* * * I wish to clear up a matter in regard to procuring of a signature from the police files of the City of Duluth. The reason that document was produced was for the sole purpose of finding an example of the defendant's handwriting so that an expert would be able to compare a writing that was by evidence, testified to as a true writing with a writing that was alleged to be that of the defendant. The fact that many years ago an insignificant matter occurred in Duluth, that the Police Department of Duluth procured the defendant's signature is beside the point, and will not be considered by you. I will assure you that such an incident would in no manner, affect your verdict as it is in no way connected with the issues here to be tried. I guess it is common knowledge that records are kept on insignificant matters even so small as violations of a traffic ordinance, so, therefore, the fact that the police have a record is nothing against the defendant and shall not be considered in any manner or way by you, nor shall you be prejudiced because of that."

So far as possible, the trial court deleted such portions of state's exhibit O as were not relevant to the purpose for which it was offered. Defendant, in contending that prejudicial error resulted with respect to state's exhibit O, cites State v. Wofford, 262 Minn. 112, 114 N. W. (2d) 267; State v. Elli, 267 Minn. 185, 125 N. W. (2d) 738; and State v.

Gress, 250 Minn. 337, 84 N. W. (2d) 616. These cases clearly support the proposition that attempts to inject prejudicial matter such as conviction of a prior criminal offense will justify and sometimes require the directing of a new trial. The rule relied upon does not apply here where defendant was forewarned that an arrest record would be offered in evidence as a sample of his handwriting needed to lay the foundation for expert testimony as to the authorship of writings appearing on critical exhibits allegedly written by defendant; where the record indicates that this particular sample of handwriting was essential to the foundation for the expert's opinion; where the state was willing to withdraw the exhibit if defendant stipulated that the handwriting appearing on it was his so as to permit the expert to use the knowledge secured in examining it as a basis for making a comparison of the handwriting attributed to defendant on the questioned documents; and where after all efforts to eliminate the prejudicial impact of the exhibit were exhausted, it was received but the jury was warned by clear and unequivocal instructions of its limited purpose.

We have also considered the cumulative effect of the alleged errors, notwithstanding our opinion that considered separately no one of them would justify the granting of a new trial. In doing so, we have reviewed the evidence as a whole and the general conduct of the trial. We do not believe that the interests of justice dictate a new trial in this case.

Affirmed.