## STATE v. CLAUDE MARVIN WATTS, JR.

208 N. W. 2d 748.

June 15, 1973—No. 43660.

C. Paul Jones, State Public Defender, and Ronald L. Haskvitz, Assistant State Public Defender, for appellant.

Warren Spannaus, Attorney General, George M. Scott, County Attorney, Theodore R. Rix, Vernon E. Bergstrom, and Michael McGlennen, Assistant County Attorneys, for respondent.

Heard before Knutson, C. J., and Peterson, Todd, and MacLaughlin, JJ.

MacLAUGHLIN, JUSTICE.

Defendant appeals from a conviction of kidnapping. Minn. St. 609.25, subd. 1(2, 3). Defendant was tried by a jury and testified on his own behalf. We affirm.

The victim, Philip William Chase, age 56, testified that on Saturday afternoon, July 17, 1971, he was waiting for a bus at the corner of Fourth Avenue and Lake Street in Minneapolis. Chase was carrying a bag of groceries at the time. He testified at trial that he glanced out of the corner of his eye and saw defendant coming up Fourth Avenue toward Lake Street and pass back of him. As defendant passed, he hit Chase, causing him to fall to the sidewalk.

Chase went into a nearby paint store, and defendant followed. Defendant hit him again, and the next thing Chase remembered was awaking in an alley just as defendant was throwing a barrel at him.

Walter Scott, an employee in the paint store, saw Chase and a man he identified as defendant fighting in the store. Scott called the police. Robert Kresal, also an employee in the paint store, saw a man he identified as defendant hit, kick, and knee Chase, and then drag and push Chase, who was "foggy" and "dead weight," out the door by holding him by the back of the neck or shirt. Mary Fey, a customer in the paint store, saw a man she identified as defendant hit and kick Chase several times and take him out of the store "definitely * * * against his will."

Wesley Kight, 17 years of age, while riding in a car on Lake Street, saw a man he identified as defendant taking Chase down the street with his hand on the back of Chase's neck. The car's driver, Patrick Scott, turned the car around, stopped, and called the police. The two boys, after seeing several people peering into an alley, drove around to the back of the alley. In the alley, Patrick Scott saw a man he identified as defendant striking Chase. The police arrived and, after pursuing defendant, arrested him. Two of the several officers who had assisted in arresting defendant testified as to the details of the arrest. The distance from the paint store to the alley where victim Chase was found is 224 feet. Defendant, after proper Miranda warnings, denied he attacked Chase.

At trial defendant denied ever having seen Chase prior to the preliminary hearing and testified that the police arrested him while he was being robbed outside the Malibu Bar, which is next door to the paint store. His testimony squarely contradicted the state's witnesses as to the details of his arrest. Two other defense witnesses testified that defendant was drinking with them in the Malibu Bar, but their testimony concerning when defendant left the bar was uncertain.

It is claimed by defendant on appeal that (a) the evidence was insufficient to sustain the conviction of kidnapping, (b) defendant was denied due process and a fair trial because certain identification witnesses saw a photograph of defendant unaccompanied by photographs of any other individuals, and (c) defendant was denied Fifth-Amendment rights when a police officer testified that defendant was given Miranda warnings and refused to talk after they were given.

1.   In determining the question of whether the evidence is sufficient to sustain the conviction, our scope of review is limited to ascertaining whether, under the evidence contained in the record, the jury could reasonably find the accused guilty of the offense charged. State v. Combs, 292 Minn. 317, 195 N. W. 2d 176 (1972).

We have carefully reviewed the evidence and are satisfied that there was sufficient evidence to sustain defendant's conviction for kidnapping. Defendant correctly contends that Chase's identification of him as his kidnapper and his recollection of events of that day were confused and inconsistent. Chase testified at the preliminary hearing that he could not honestly say that he remembered his assailant's face. Later, however, at trial, he identified defendant. When he was asked by defense counsel why he was then able to do so, he replied, "I seen him at the pretrial." One of the police officers testified that Chase had told him at the scene that he had run down Lake Street and into the alley. At trial, Chase testified that he did not recall how he had gotten into the alley.

In contrast to Chase's inconsistent testimony, the testimony of five eyewitnesses was clear. Mary Fey, Robert Kresal, and Walter Scott saw defendant in the paint store; Wesley Kight saw defendant take Chase down Lake Street; and Patrick Scott saw defendant hitting Chase in the alley. Each of the five identified defendant. We hold that this is ample evidence of defendant's identification to support the jury's verdict.

Likewise, the evidence was sufficient to support the charge of kidnapping. Robert Kresal and Mary Fey testified that defendant forced Chase out of the paint store against his will. Wesley Kight testified he saw defendant taking Chase down the street with his hand on the back of Chase's neck. Patrick Scott testified he saw defendant beating Chase in the alley. We hold there was sufficient evidence to establish that defendant forcibly led Chase to the alley some 224 feet from the paint store.

The confusion and uncertainty of victim Chase as to the events of that day are more than understandable. He was attacked without warning in broad daylight on a heavily traveled public street in Minneapolis. The attack was followed by an episode of violence and terror during and after which the most composed person could become disoriented and confused. At least two witnesses confirmed that Chase was very disturbed and upset after the in-

cident. The evidence of the five eyewitnesses more than overcomes the confusion in Chase's testimony and is sufficient to support the verdict.

Further, there is no doubt that the facts legally support the kidnapping conviction. Minn. St. 609.25, subd. 1, provides in part as follows:

"Whoever, for any of the following purposes, confines or removes from one place to another, any person without his consent * * * is guilty of kidnapping and may be sentenced as provided in subdivision 2:

\* \* \* \* \*

(2) To facilitate commission of any felony or flight thereafter; or

(3) To commit great bodily harm or to terrorize the victim or another * * *."

In State v. Morris, 281 Minn. 119, 160 N. W. 2d 715 (1968), we held that it is not necessary under § 609.25, subd. 1, to prove that the defendant confined his victim for a "substantial" period of time or removed him a "substantial" distance in order to establish the crime of kidnapping. The facts of this case, therefore, are sufficient to justify the kidnapping conviction.

2. Three of the five witnesses who identified defendant were shown, either deliberately or inadvertently, a photograph of defendant. This occurred while the witnesses were being interviewed by the police. Each time, the photograph was unaccompanied by photographs of other individuals. Reversal is required where, judged by the totality of circumstances, the conduct of identification procedures is so unnecessarily suggestive and conducive to an irreparable mistaken identification as to be a denial of due process of law. Foster v. California, 394 U. S. 440, 89 S. Ct. 1127, 22 L. ed. 2d 402 (1969); Simmons v. United States, 390 U. S. 377, 88 S. Ct. 967, 19 L. ed. 2d 1247 (1968). The problems attendant upon photographic identification were detailed in Simmons, where the court observed (390 U. S. 383, 88 S. Ct. 971, 19 L. ed. 2d 1253):

"* * * A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. * * * Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification."

However, even though the photographic identification may be questionable, the state may establish by clear and convincing evidence that the in-court identification was based upon observations of the suspect other than the single photograph shown to the witnesses. United States v. Wade, 388 U. S. 218, 87 S. Ct. 1926, 18 L. ed. 2d 1149 (1967).

In this case, the three witnesses who observed the photograph had had ample opportunity to observe defendant at the scene of the crime. Patrick Scott confronted defendant face-to-face in the alley and witnessed his arrest. Wesley Kight observed defendant both on Lake Street and in the alley and observed his arrest. Robert Kresal observed defendant from 5 to 10 minutes in the paint store. Importantly, the two other witnesses who identified defendant, Mary Fey and Walter Scott, did not see any photographs of defendant before trial. We hold that the identification of defendant was sufficient under constitutional standards and that the identification of defendant by the three witnesses who saw his photograph did not constitute reversible error.

3. Defendant claims that he was denied Fifth-Amendment rights when a police officer testified at the trial that he had

given defendant Miranda warnings and that defendant had refused to talk after receiving the warnings. Defendant made no objection to the evidence at the time the officer testified.

After relating that he had given defendant the Miranda warnings, the officer testified as follows:

"A. * * * And then I asked him if he understood these rights.

"Q. What did he say to that?

"A. He acknowledged that he did.

"Q. Did you ask him if he wished to talk to you?

"A. Yes, we did.

"Q. What did he reply to that?

"A. He replied—or didn't reply negative but—.

"Q. Did he not reply in the negative?

"A. He didn't reply but he made it clear that he didn't want to talk to us."

In State v. Beck, 289 Minn. 287, 183 N. W. 2d 781 (1971), we held that where a defendant did not take the stand it was error to receive evidence of an arresting officer that he had advised defendant of his right to remain silent. The testimony was not intended as a foundation for the admission of any statement by the defendant and had no legitimate probative value. Even though the officer did not testify that the defendant did indeed remain silent, we reversed the conviction.

However, in State v. Combs, *supra,* we held that where the defendant talked to an officer after being given Miranda warnings and later testified on his own behalf, and where it appeared that evidence regarding the giving of Miranda warnings was admitted to provide a foundation for the admission of subsequent statements made by the defendant to the officer, it was not reversible error to admit evidence of the Miranda warnings.

In our opinion, this case falls within the rule in Combs. Subsequent to the Miranda warnings, despite his initial refusal to talk, defendant made statements to the police regarding his activities on the afternoon in question. The admission of evidence that

Miranda warnings were given to defendant served as a foundation for admission of those statements into evidence. Moreover, it must be noted that no objection was made to the officer's testimony. We held in Combs that an objection cannot be raised for the first time on appeal.

In State v. Roberts, 296 Minn. 347, 208 N. W. 2d 744 (1973), we held that testimony by the interrogating officer that the defendant had requested counsel when asked if he had committed the crime had no legitimate probative value and admission of the testimony was reversible error under the facts of that case. Unlike the testimony in Combs, the testimony in Roberts did not serve as a foundation for admission of later statements by the defendant, and it had no other proper use. In the instant case, the testimony regarding defendant's desire not to talk was admitted in connection with his response to the Miranda warning itself and not in response to the ultimate question of whether he had committed the crime. Further, in this case, unlike Roberts, defendant chose to make statements to the police after indicating that he wished to remain silent.

The better practice would have been to elicit testimony of the Miranda warnings without the subsequent testimony that defendant "made it clear that he didn't want to talk to us." However, since the facts fall within the rule of the Combs case, and since no objection was made at trial, we hold the receipt of the evidence was not so prejudicial as to constitute reversible error.[1]

Affirmed.

---

[1] Evidence was also admitted that defendant had told an interrogating officer that he had heard Miranda warnings many times before. Even if such evidence was erroneously admitted, it could not have been prejudicial to defendant in light of evidence at the trial of defendant's many previous convictions, including burglary, petty larceny, petty theft, simple assault, and aggravated assault.