## STATE v. ARLO CHARLES VAN ALSTINE.

232 N. W. 2d 899.

September 5, 1975—No. 44585.

C. *Paul Jones,* State Public Defender, and *Robert E. Oliphant* and *Martin Costello,* Assistant State Public Defenders, for appellant.

*Warren Spannaus,* Attorney General, *John O. Sonsteng,* County Attorney, and *George L. May* and *Robert F. Carolan,* Assistant County Attorneys, for respondent.

Heard before Otis, MacLaughlin, and Knutson, JJ., and considered and decided by the court en banc.

MACLAUGHLIN, JUSTICE.

This is an appeal from a judgment of conviction of attempted murder in the first degree in which defendant challenges the jurisdiction of the trial court, the refusal of the trial court to hold a Rasmussen hearing on certain evidence revealed during the 8-day jury trial, the admission of certain testimony of a coconspirator, and the alleged prejudicial conduct of the prosecutor in his final argument to the jury. We affirm.

The basic facts are simple and not in dispute. Defendant, Arlo Charles Van Alstine, was dating and planning to marry Deborah Montague, stepdaughter of Earl Kuhn, the victim of the crime. Mr. Kuhn was employed part time as a security guard in an unfinished apartment complex in West St. Paul.

On the evening of August 13, 1972, defendant, along with Ervin Gusa and George Scott, a juvenile, went to the site of Kuhn's employment, armed with knives and a hatchet and carrying masks to disguise themselves. During the violent attack which followed, Kuhn was stabbed in the back approximately 19 times. The three persons involved then took Kuhn's wallet and fled the scene. After extensive surgery, Kuhn survived.

Defendant and Gusa had planned the attack approximately one week in advance. Irene Kuhn, the wife of the victim, was aware of the plan and had approved it in advance. In fact, Mrs. Kuhn and her daughter, Rita O'Neill, drove defendant, Gusa, and Scott to the scene of the crime. Mrs. Kuhn's other daughter, Deborah Montague, sewed the face masks used by the perpetrators of the crime.

Defendant admitted all of the above facts at trial. However, he took the position that he was guilty only of aggravated assault and not attempted murder. Thus, the major issue at trial was whether defendant intended to kill Mr. Kuhn, as the state claimed, or merely to rough him up and teach him a lesson, as defendant claimed.

Defendant argues the following issues on this appeal:

(1) Was the trial court without jurisdiction because defendant was denied his right to challenge the grand jury which indicted him?

(2) Was defendant entitled to a Rasmussen hearing to consider constitutional questions raised by defendant regarding certain evidence obtained by the state after the trial had begun?

(3) Did the trial court commit reversible error in admitting into evidence certain extrajudicial declarations of defendant's

coconspirator Scott when those declarations were made after the termination of the conspiracy?

(4)   Was the prosecutor guilty of such prejudicial misconduct in his closing argument as to deny defendant a fair trial?

■   Defendant asserts that the trial court lacked jurisdiction because defendant was allegedly denied his right to challenge the grand jury which indicted him.

Minn. St. 628.52 provides:

"Any person held to answer a charge for a public offense may challenge the panel of the grand jury or any individual grand juror before they retire, after having been sworn and charged by the court."[1]

Defendant claims the prosecutor misled him as to the grand jury indictment and thereby prevented him from exercising his right to challenge. The state insists that defendant had an opportunity to exercise the right but waived it. At the core of this dispute is a factual issue. The attorneys involved disagree as to whether the prosecutor notified defense counsel that defendant would be indicted rather than informed against. Defendant was charged by complaint on August 29, 1972. At his initial court appearance on August 29, 1972, a preliminary hearing was scheduled for September 21, 1972. The state claims that a short time after the first court appearance the prosecutor informed defendant's counsel that the state would proceed by indictment. The state contends that neither defendant nor his counsel followed up this announcement with a request for information regarding the time and place the grand jury would convene. Defendant, now represented by different counsel, insists that the first time he knew of the grand jury was when the indictment was read to him at his arraignment on September 20, 1972, one day prior to the date which had been set for the preliminary hear-

---

[1] See Minn. St. 628.52 to 628.55, which provide grounds for challenge and other provisions relating thereto.

ing, and at a time when it was too late to exercise his right to challenge.

The trial court, after considering this precise question, made the following finding of fact: "[Defendant] had knowledge that a grand jury was to be convened and had ample opportunity to perfect available statutory challenges."

Our review of the record, including an affidavit from the prosecutor stating that defendant's attorney had been informed of the prospective grand jury action, leads us to the conclusion that the trial court's finding is not clearly erroneous and has ample support in the record. Therefore, defendant's claim that he was denied his opportunity to challenge is without merit. We have held that a defendant who has notice that a grand jury will consider his case must make inquiry as to the details before he can claim that he was prevented from exercising his right to challenge. State v. Hinckley, 4 Minn. 261 (345) (1860). Since defendant made no such inquiry, he cannot now complain that he was denied his right to challenge.

Because of our disposition of this issue, we need not decide whether the indictment would be rendered void, based upon the applicable facts of this case, if defendant had been denied his right to challenge the grand jury.

■   Defendant argues that the trial court erred in not holding a Rasmussen hearing to answer constitutional questions regarding certain evidence offered by the state during the course of the trial. The evidence in question, a note written by defendant to Ervin Gusa while both were confined in the Dakota County jail, was obtained after a Rasmussen hearing had been held and after the trial had begun.

The note threatened Gusa if he testified against defendant and offered payment to Gusa if he would testify that defendant was not involved in the crime.[2] When the state offered the note as

---

[2] The full text of the note is as follows: "Erwin: I am writing to you for a reason. I want to make a deal with you. I know that you got your nine years by agreeing to cop-out on me. I tell you what, you already

an exhibit, defendant objected and claimed that a Rasmussen hearing was required before it could be admitted. After considering an offer of proof from the prosecutor, the trial court admitted the exhibit without a Rasmussen hearing.

Thereafter, the state introduced evidence to show that defendant had written the note on March 10, 1973, and given it to his cellmate, Richard Beyer. Beyer testified that defendant told him to give the note to Noel Wagenman, a trustee, and tell Wagenman to give it to Gusa, who was in another cellblock. Beyer also testified that he gave the note to Wagenman and repeated defendant's message. Wagenman testified that Beyer handed him the note, telling him to give it to Gusa, but that rather than taking the note to Gusa, he gave it to the jailer. The jailer testified that Wagenman walked up and handed him a note, saying that it was for Gusa. The jailer read the note and gave it to an official in the sheriff's office, who testified that after reading the note he locked it up for the weekend and took it to the county attorney's

---

have your part of the deal and they cannot take it away from you now no matter what you say in court. They cannot take and give you more time. So what I am offering is this, I will pay you as much as you ask for. I have a few connections I am sure you remember that. I will pay you any amount you ask for if you will go into the courtroom and tell them that I had nothing to do with it. [I]t was just you and Scott. If they ask you why you lied at first tell them that you and Scott were just trying to cop a good deal. Also tell them that I went with you to West St. Paul, but left you there and you do not know [where] I went. I can pay you up to 20,000.00 dollars. And I can pay up within a week after I [get] out. Also George O'Leary went up to [Stillwater] to see some of his friends. He said that if I [get] sent up you will never live to see your parole. Accidents happen all the time. If you remember George, you know he means what he says. You have a choice help me, and [get] very well [paid], or you [will] never walk out of [S]tillwater. You have the whole weekend to think about it. I hope you help me. I would hate to see something happen to you. I have a friend on the streets that has some big jobs lined up worth plenty. I can and will pay you within one week. If I don't, all you have to do is tell the cops the truth so you know I will have to pay you. I will pay you 20,000.00 dollars."

office on the following Monday morning, March 12, 1973. The county attorney did not notify the trial court and defendant's counsel of the existence of the note until March 20, 1973.

The issue is whether the trial court erred in not interrupting the trial to hold a Rasmussen hearing at the time the state sought to introduce the note. In State v. Kluck, 299 Minn. 161, 217 N. W. 2d 202 (1974), we approved the action of the trial court in holding a Rasmussen hearing in the middle of a trial where the prosecutor failed to disclose his intention to introduce certain evidence prior to trial and where the evidence was properly subject to a Rasmussen hearing.

Defendant contends that the note was a statement in the nature of a confession and was obtained by search and seizure and that, therefore, a Rasmussen hearing was required. See, State ex rel. Rasmussen v. Tahash, 272 Minn. 539, 141 N. W. 2d 3 (1965). Defendant claims that the note was a statement in the nature of a confession because it was a communication containing admissions tending to show defendant's guilt of the charge of attempted murder. A Rasmussen hearing was required, it is claimed, to litigate the question of whether the statements in the note were made voluntarily and whether the possession of the note by the authorities came about because of a taking or a seizure.

At trial defendant testified that he wrote the note and gave it to Beyer to transmit to Gusa but that Beyer "kept on reminding me to write it." Beyer denied any such involvement. Because of this testimony defendant now claims the alleged "confession" was coerced from him by Beyer.

While it would not have been inappropriate for the trial court to hold a Rasmussen hearing on the questions raised by defendant concerning the note,[3] we hold that the trial court did not err in failing to afford a Rasmussen hearing on this ground because the note in question did not constitute a "confession" within the

---

[3] We also observe that the prosecutor should have promptly revealed his possession of the note to the court and to defendant.

meaning of Rasmussen. Rasmussen makes clear that a communication to a private citizen is not considered a confession for purposes of the procedure which was set forth in that case. In Rasmussen we referred to "the admissibility of confessions or statements in the nature of confessions *obtained by law enforcement authorities* from persons charged with crime * * *." 272 Minn. 552, 141 N. W. 2d 12. (Italics supplied.)

A similar question arose in State v. Sharich, 297 Minn. 19, 21, 209 N. W. 2d 907, 910 (1973). In that case, we said:

"At the trial, the prosecution presented testimony from defendant's mother and stepfather in the nature of admissions by defendant against interest. While these statements were made after her arrest, they were not made while she was in custody but were made subsequent to her release on an appearance bond. The defendant apparently claims the admission of these incriminating statements violated her rights to notice and a pretrial hearing on admissibility under State ex rel. Rasmussen v. Tahash, 272 Minn. 539, 141 N. W. 2d 3 (1965), and that if such a hearing had been held, the statements would have been held inadmissible under Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694 (1966). We do not agree. The rule in Miranda is designed to afford an individual who is 'subjected to custodial police interrogation' his Fifth Amendment privilege against self-incrimination. 384 U. S. 439, 86 S. Ct. 1609, 16 L. ed. 2d 704. Defendant's statements were clearly made in a noncustodial setting, and any question of voluntariness separate from rights under Miranda does not appear to be involved."

The theories behind the holding in Sharich are: (1) If the admission in question is not a confession for exclusionary-rule purposes, the defendant has no right to a Rasmussen hearing to raise constitutional challenges; and (2) an admission to a private citizen is not a confession which is subject to a constitutional challenge. See, State v. LaRose, 286 Minn. 517, 174 N. W. 2d 247 (1970); State v. King, 286 Minn. 392, 176 N. W. 2d 279 (1970).

Consequently, it was not error to deny a Rasmussen hearing to challenge on constitutional grounds the admission of statements made by defendant to a private citizen.

Defendant also argues that a Rasmussen hearing was required because physical evidence belonging to him was obtained by the authorities through a taking or seizure. Defendant contends that he did not consent to the taking of the note by the authorities and that he was the victim of an unlawful seizure when it was taken by the authorities. We disagree and hold that there was no seizure involved in the receipt of this note by the authorities. The ultimate test used to determine the existence of a search and seizure within the meaning of the Fourth Amendment is whether the defendant has a protected expectation of privacy and whether that privacy was invaded. Katz v. United States, 389 U. S. 347, 88 S. Ct. 507, 19 L. ed. 2d 576 (1967).

Lanza v. New York, 370 U. S. 139, 143, 82 S. Ct. 1218, 1220, 8 L. ed. 2d 384, 387 (1962), involved facts similar to the present case. There, defendant's communications with his brother in a prison visiting room were intercepted by means of electronic surveillance by prison officials. In holding that the communication was not protected by the Fourth Amendment, the court stated:

"* * * To be sure, the Court has been far from niggardly in construing the physical scope of Fourth Amendment protection. A business office is a protected area, and so may be a store. A hotel room, in the eyes of the Fourth Amendment, may become a person's 'house,' and so, of course, may an apartment. An automobile may not be unreasonably searched. Neither may an occupied taxicab. Yet, without attempting either to define or to predict the ultimate scope of Fourth Amendment protection, *it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day.*" (Italics supplied.)

The rationale of the Lanza case clearly applies to the facts of this

case. Under the circumstances, we hold that defendant was not entitled to assert a protected expectation of privacy, and a Rasmussen hearing was not required on the basis of a search and seizure.

■ A witness, Jennie Lee Rolfer, testified for the state as to a conversation she had with George Scott the day after the crime. During her testimony, the following exchange ensued:

"Q. Did George tell you why Mr. Van Alstine here had stabbed Mr. Kuhn?

"A. For money.

"Q. Do you remember exactly what he said?

"A. Mr. Kuhn had a lot of insurance, or had insurance, and he had been a security cop, so something about insurance, that they take out, and they wanted the money."

The trial court admitted this evidence over defendant's hearsay objection on the grounds that the out-of-court declarations by one coconspirator made in furtherance of the common purpose are admissible against other coconspirators. Defendant claims that this exception to the hearsay rule does not extend to declarations made after the termination of the conspiracy.

We agree with defendant and hold that it was error to admit the testimony in question. Several Minnesota cases have expressed the rule that narratives of past actions taken in furtherance of a conspiracy, and made by a conspirator after the termination of the conspiracy, are inadmissible against other conspirators. State v. Zabrocki, 194 Minn. 346, 260 N. W. 507 (1935); State v. Sweeney, 180 Minn. 450, 231 N. W. 225 (1930); State v. Hunter, 131 Minn. 252, 154 N. W. 1083 (1915); State v. Palmer, 79 Minn. 428, 82 N. W. 685 (1900); State v. Thaden, 43 Minn. 253, 45 N. W. 447 (1890); Adler v. Apt, 30 Minn. 45, 14 N. W. 63 (1882).

The trial court's erroneous admission of this evidence, however, does not require reversal of defendant's conviction. Though defendant contends that this evidence was a major part of the

evidence introduced by the state to show the intent and premeditation necessary to a finding of attempted first-degree murder, the transcript reveals ample evidence supporting these elements of the offense.

For example, the victim testified that he was suddenly attacked from behind and stabbed many times in the back. The severity and quantity of the wounds, as described by the doctor, establish intent to do more than merely teach the victim a lesson. Also, there was evidence by an acquaintance of defendant that defendant had asked him a few weeks before the incident whether he wanted to kill Kuhn. This same witness testified that defendant wanted Kuhn killed because of his desire to marry Deborah Montague, because Kuhn was not buying groceries for his family, and because Kuhn had $20,000 to $25,000 life insurance at the plant where he worked. As further evidence of intent, George Scott testified that defendant stabbed Kuhn in the back while he was lying on the ground.

Under the circumstances the testimony of Jennie Lee Rolfer was merely cumulative because other evidence of defendant's guilt was overwhelming. It seems clear that the verdict would not have been different if the questioned evidence had not been admitted. Therefore, we hold that the error in the admission of this testimony is not so prejudicial as to require a new trial.

■ Defendant contends that the prosecutor injected his personal opinion as to defendant's guilt into his closing argument and that he attacked defendant's character, even, though defendant had not put his character in issue. The test which we have adopted in determining whether a new trial is required in such cases is whether the prosecutor's conduct played a substantial part in influencing the jury to convict. State v. Caron, 300 Minn. 123, 218 N. W. 2d 197 (1974); State v. White, 295 Minn. 217, 203 N. W. 2d 852 (1973).

The specific statements which defendant claims injected the prosecutor's personal opinion into the argument are as follows:

"* * * *I think* that is overwhelming evidence for preparing

for this incident, to kill Mr. Kuhn. Just manifestly overwhelming.

\* \* \* \* \*

"Now, the argument is going to be, this is an assault. This is an aggravated assault. *I don't think so. I think* the evidence shows otherwise. This is clearly, overwhelmingly an attempt at murder. \* \* \* You are going to be asked to make the decision.

"*I don't think* there is ever a decision, any question about any guilt, or innocence in this case. *I think* the evidence is overwhelmingly that this man is guilty, but *I think* in the same sense he is not guilty of that lesser crime of aggravated assault. He is guilty of attempted murder in the first degree."

It is clear, and the state concedes, that our decision in State v. Prettyman, 293 Minn. 493, 495, 198 N. W. 2d 156, 158 (1972), expressly holds this type of language to be impermissible. We there said:

"In final argument the prosecuting attorney frequently began a sentence with the words, 'I think'; e.g., 'I think you'll find that \* \* \*' or 'I think you will be able to find that \* \* \*,' followed by reference to evidence on an issue or a permissible inference that could be made. The frequency and context of the use of these words suggests to us that they were perhaps more idle cliche than deliberate expression of personal opinion, and the absence of objection by the defense counsel who actually heard them adds to this impression. They are, nevertheless, impermissible. [Citations omitted.] Although always wrong, such comments are not always prejudicial. The strength of the evidence against defendant and the otherwise balanced argument addressed to the jury's acknowledged role in judging the evidence may be considered in determining whether such comments infected the verdict. So considered, we conclude that there was no reversible error."

In this case, as in Prettyman, we have concluded that the impermissible reference to personal opinion did not infect the verdict and is not so prejudicial as to require a new trial. Elsewhere

in his argument the prosecutor expressly acknowledge the jury's role in judging the evidence. Further, the evidence supporting defendant's guilt is so overwhelming as to preclude a determination that this argument had any substantial effect upon the verdict.

Defendant's argument that the prosecutor made impermissible attacks on defendant's character is without merit. The references concerned the characterization that defendant was "vicious" in his attack on Kuhn and a reference to language in the note from which the prosecutor concluded that defendant had a "propensity for doing this sort of thing." While the comment on defendant's "propensity" for "this sort of thing" might well have been omitted from the argument, there was certainly sufficient evidence from which to conclude that the attack on Kuhn was vicious. In summary, we conclude there are no grounds for a new trial based upon the prosecutor's final argument to the jury.

Affirmed.

MR. JUSTICE TODD took no part in the consideration or decision of this case.