STATE v. TERENCE BRUCE WALKER.*

235 N. W. 2d 810.

October 31, 1975—No. 42778.

---

* Certiorari denied, 426 U. S. 950, 96 S. Ct. 3172, 49 L. ed. 2d 1187 (1976).

*C. Paul Jones,* State Public Defender, *Jerome E. Truhn,* Assistant State Public Defender, *Thomson, Wylde, Nordby, Friedberg & Rapoport,* and *Jack S. Nordby,* for appellant.

*Warren Spannaus,* Attorney General, *Keith M. Brownell,* County Attorney, and *Julie A. Baumgarten,* Assistant County Attorney, for respondent.

Heard before Rogosheske, Kelly, and Yetka, JJ., and considered and decided by the court en banc.

KELLY, JUSTICE.

Defendant appeals from a judgment of conviction of first-

degree murder and the denial of his alternative post-trial motions. We affirm.

On July 4, 1969, Milton Richardson, the owner of the Club Rendezvous, was found beaten to death in his nightclub located in Duluth. There was no witnesses to the crime, which apparently occurred in the early morning hours when Richardson was alone in the club cleaning up and counting the previous day's receipts. The apparent motive was robbery, although the brutality of the way Richardson was bludgeoned to death was atypical of murder incidental to robbery.[1] On August 27-28, 1969, following an intensive police investigation, the defendant and one Richard Redd were arrested in connection with this case and charged with first-degree murder. Following a plea of not guilty, defendant was tried separately by a jury in Duluth.

At defendant's trial the state presented the following evidence in proof of defendant's guilt of the crime with which he was charged:

Testimony from Lee Wiley, a bartender at Club Rendezvous, revealed that appellant and Richard Redd were served drinks in the bar on the evening of July 3, 1969. Wiley, who had known appellant for a number of years, was able to give a description of the clothes worn by both men. The other bartender supplied a physical description of each.

---

[1] Dr. Cyril Smith, St. Louis County coroner, testified that in examining the body he found numerous deep cuts on Richardson's face; a fractured nose and bone leading to the nose; a cut over his right eye which punctured the eyeball; three deep cuts on the right side of the head; two deep lacerations on the back of his head; two bruises which stretched out to the side of his body from the navel area; and two broken fingers, markedly deformed. Dr. Smith expressed the opinion that these wounds were the cause of death and that they were inflicted over a period of 20 to 30 minutes. The autopsy, performed by Dr. Arthur Aufderheide, chief pathologist at St. Mary's Hospital in Duluth, further revealed multiple cuts and bruises on the arms, legs, and shoulders of the deceased; bruises on the lower abdomen and chest approximately 1/2 inch wide and 10 to 12 inches long; and a broken rib.

Appellant admitted he had access to a 1959 Cadillac, the color of which was a light red or pink. One Patrick Perfetti testified that while driving past the Rendezvous around 2:15 a. m. on July 4, 1969, he saw a black man fitting appellant's description running in the vicinity of the club and that the man seemed to come out of the doorway of the Club Rendezvous. The man proceeded east on Michigan Street and went into an empty parking lot. As Perfetti's car reached the edge of the lot, a 1959 4-door, hardtop Cadillac, light-colored, rusty and in shabby condition, and with no headlights on, shot out from the lot over the curb in front of Perfetti. Perfetti had to hit his brakes in order to avoid a collision. The car proceeded east at a high rate of speed, going through a stop sign one block away. Two black males were sitting in the front seat of the Cadillac. Perfetti identified photographs of the Cadillac to which appellant had access and which he had been seen driving about the date of the murder as appearing to be the same make, model, and in the same condition as the car he had seen.

Two prosecution experts testified that latent bloody palm prints found at the scene of the murder matched palm prints of appellant and Redd. The 1959 Cadillac used by appellant was purchased by the Duluth Police Department, taken to the St. Louis County garage, and searched. Blood stains of appellant's type, Type O, were found on the driveshaft hump on the rear floor and on the rear seatwell.

Also found in the car were several minute wood fragments. An expert witness for the state testified that the varnish-type substance on all the pieces was comparable in all miscroscopic aspects with those wood pieces found at the scene of the crime. He concluded that they could have had a common source of origin. Regarding the analysis of the wood itself, the state called Dr. B. F. Kukachka, a well-known expert in the analysis and identification of wood and an employee of the U. S. Forest Service. His tests revealed that the wood pieces found in the Cadillac, in the nightclub, and on the body of the deceased were all of

Ramin, an extremely rare wood grown only in a certain area of Southeast Asia. Portions of the pool cues at Club Rendezvous were composed of Ramin wood.

Extensive testimony was received from many persons who had seen appellant, Redd, or both of them on July 3 and 4, 1969, either at the Rendezvous or at the Chicken Shack, an after-hours bar in Duluth. Finally, expert testimony regarding a yellow-orange piece of charred cloth taken from the stove at the Chicken Shack indicated that the fiber was comparable with a cardigan sweater and polo shirt set purchased by police, these articles being of a type and color which two witnesses had indicated was similar to clothing Redd was wearing. The weave of the fragment could qualify as the same weave as that found on the cuffs, waistband, and neck of the polo shirt.

At the close of the 7-week trial, the jury deliberated 2 days before returning a verdict finding defendant guilty of murder in the first degree. The presiding judge sentenced defendant to mandatory life imprisonment, as required by Minn. St. 609.185, and this appeal followed.

Defendant raises seven issues for this court to resolve:

(1) Whether the mandatory life sentence under Minn. St. 609.185 violates the state and Federal constitutional provisions against cruel and unusual punishment, due process, and equal protection of the law;

(2) whether the testimony of two fingerprint experts constituted proper rebuttal evidence;

(3) whether evidence which implicated Richard Redd as a participant in the crime with the defendant was properly admitted at defendant's trial;

(4) whether testimony regarding defendant's custodial statements violated his Fifth Amendment privilege against self-incrimination;

(5) whether there was sufficient evidence to establish involvement and premeditation beyond a reasonable doubt;

(6) whether the trial court erred in not submitting lesser included offenses for the jury's consideration;

(7) whether the totality of the circumstances leading up to defendant's conviction denied him a fair trial.

■ A life sentence for first-degree murder is mandated by Minn. St. 609.185. This section is supplemented by § 243.05, which provides for a person convicted under § 609.185(1) a 25-year minimum prison term, less time credited for good behavior, before he can be paroled. Defendant argues that this sentencing pattern violates substantive and procedural due process of law, denies equal protection, and constitutes cruel and unusual punishment under the Minnesota and Federal Constitutions. Historically and up to this present day, the prohibition against cruel and unusual punishments[2] has only been applied to those situations presenting severely cruel elements[3] or a degree of severity out of all proportion to the offense.[4] The most recent example is the United States Supreme Court decision in Furman v. Georgia, 408 U. S. 238, 92 S. Ct. 2726, 33 L. ed. 2d 346 (1972), holding the death penalty as then currently applied was unconstitutional. However, as applied to minimum mandatory sentences, no court has gone so far as to say that they are cruel and unusual punishments.[5]

---

[2] U. S. Const. Amend. VIII; Minn. Const. art. 1, § 5.

[3] Weems v. United States, 217 U. S. 349, 30 S. Ct. 544, 54 L. ed. 793 (1909) (chains, painful labor); In re Kemmler, 136 U. S. 436, 10 S. Ct. 930, 34 L. ed. 519 (1890) (burning at the stake, crucifixion, breaking on the wheel); Chambers v. Florida, 309 U. S. 227, 60 S. Ct. 472, 84 L. ed. 716 (1940) (rack, thumbscrew); Wilkerson v. Utah, 99 U. S. 130, 25 L. ed. 345 (1878) (disemboweling); Jackson v. Bishop, 404 F. 2d 571 (8 Cir. 1968) (flogging); Medley, Petitioner, 134 U. S. 160, 10 S. Ct. 384, 33 L. ed. 835 (1889) (some solitary confinement); and cf. Brooks v. Florida, 389 U. S. 413, 88 S. Ct. 541, 19 L. ed. 2d 643 (1967).

[4] Weems v. United States, *supra*; Trop v. Dulles, 356 U. S. 86, 78 S. Ct. 590, 2 L. ed. 2d 630 (1958); Robinson v. California, 370 U. S. 660, 82 S. Ct. 1417, 8 L. ed. 2d 758 (1962); Note, 79 Harv. L. Rev. 635, 636 to 645 (1966).

[5] Upholding the constitutionality of minimum mandatory sentences: United States v. Ross, 464 F. 2d 376 (2 Cir. 1972); United States v.

In our view, a 25-year minimum sentence, less time off for good behavior, prescribed in the wisdom of the legislature, is not excessive or out of proportion to the offense of first-degree murder. Such minimum sentences do serve a valid purpose in assuring that the offender will not return to society at too early a point after commission of the crime. Nor does the defendant have a right to a postconviction presentence hearing to show his susceptibility to rehabilitation. While Minn. St. 609.115 gives the trial judge the option of requiring a presentence investigation of persons convicted of felonies not carrying mandatory life sentences, and as part of such investigation requiring that an estimate be made of the prospects of the subject's rehabilitation, no defendant has an absolute right to demand that this procedure be employed. Thus, the contention of a procedural due process violation based on the lack of a hearing on defendant's prospects of rehabilitation is without merit. Likewise, we view the fact that all persons convicted of first-degree murder receive the same minimum sentence as persuasive that defendant's sentence does not violate substantive due process or deny those so sentenced equal protection of the laws.[6]

Upon these bases we have no difficulty in holding that defendant's mandatory life sentence under Minn. St. 609.185, with a minimum imprisonment of 25-years less time credited for good behavior under § 243.05, does not violate his state or Federal constitutional rights.

■ During its case in chief, the state called two fingerprint experts who testified that latent palm prints found at the scene of the murder matched inked impressions obtained from Redd and the defendant. The defense called Dr. Vassislis C. Morfopou-

Lozaw, 427 F. 2d 911 (2 Cir. 1970); United States v. Drotar, 416 F. 2d 914 (5 Cir. 1969); United States ex rel. England v. Anderson, 347 F. Supp. 115 (D. Del. 1972).

[6] Moore v. Missouri, 159 U. S. 673, 16 S. Ct. 179, 40 L. ed. 301 (1895); Hodgson v. Vermont, 168 U. S. 262, 18 S. Ct. 80, 42 L. ed. 461 (1897); 21 Am. Jur. 2d, Criminal Law, § 582; 16A C.J.S., Constitutional Law, § 564.

los, technical director of the American Standards Testing Bureau, who stated that in his opinion, the latent palm prints were not those of the defendant and Redd and that certain dissimilarities were present. On rebuttal, the state called J. Everette Burke, an identification expert in the St. Petersburg, Florida, Police Department and a recent retiree of the FBI, and Andre Moenssens, associate professor of law and assistant dean at Chicago Kent University of Law, who specializes in scientific evidence. They testified that, contrary to what Dr. Morfopoulos had stated, the "microscopic dactylographic techniques" he used are not used by the FBI; that specific training in fingerprints is required before one can be qualified as an expert to render an opinion as to the similarity of two impressions, training which Morfopoulos admitted he did not have; that the dissimilarities found by the defense expert were too blurred and indistinct to make an exact comparison; and that in their opinions, the prints did match those of Redd and the defendant.

Defendant argues that the testimony of Burke and Moenssens was improper rebuttal evidence and should have been excluded. The rule of law is quite clear that rebuttal evidence is limited to that which explains, contradicts, or refutes defendant's evidence. Its purpose is to cut down the defendant's case and not merely to confirm the case in chief through restatement or new facts. Mathews v. Chicago & N. W. Ry. Co. 162 Minn. 313, 202 N. W. 896 (1925); VI Wigmore on Evidence, § 1873. This rebuttal testimony which refuted Morfopoulos' qualifications, methodology, and conclusions was entirely proper since it went to meet the evidence presented by the defense expert. We therefore hold that the testimony of Burke and Moenssens was proper rebuttal evidence in this case.

■ Another of defendant's assignments of error is that the trial court should not have admitted, over objection, testimony concerning clothing, conversations, whereabouts, and palm prints of the other defendant, Richard Redd. Defendant asserts

such testimony was not probative to connect him to this crime and was prejudicial to his case. We do not agree.

The established rule is that where two or more persons conspire together to commit a crime, everything said, done or written by any one of them in the execution or furtherance of the common purpose is admissible against each of them. State v. Kahner, 217 Minn. 574, 15 N. W. 2d 105, certiorari denied, 323 U. S. 768, 65 S. Ct. 121, 89 L. ed. 614 (1944) ; State v. Thompson, 273 Minn. 1, 139 N. W. 2d 490, certiorari denied, 385 U. S. 817, 87 S. Ct. 39, 17 L. ed. 2d 56 (1966). Where a conspiracy is prima facie shown as an incident to determining the admissibility of such evidence at some point during the trial, coconspirator evidence is entirely proper. State v. Guy, 259 Minn. 67, 105 N. W. 2d 892 (1960). As we view the record, there was ample evidence introduced by the state to show a conspiracy between Redd and the defendant.

Two police officers testified that the defendant told them he had been with Redd from the time of the closing of the club on the morning of the murder until the closing of the Chicken Shack at about 5 a. m. Defendant testified on his own behalf that he had been with Redd the night before the murder and during the time of the murder up until the early hours of the morning. The state proved by expert opinion testimony that a partial palm print in blood on a table was identical to the defendant's palm print and that a partial palm print in blood on a chrome strip off a juke box was identical to Redd's palm print. It becomes obvious, then, that any evidence tending to show Redd's participation in the murder was relevant to disprove defendant's claim that although he was with Redd for some hours before the murder, during the time of the murder, and for some hours thereafter, neither he nor Redd were at the scene of the murder when it occurred and, of course, that neither of them participated in the murder. Defendant contends that the testimony concerning Redd's clothing, conversations, his whereabouts for some hours before, during, and after the murder, his palm prints in blood,

and other evidence which would tend to connect Redd to the crime had no probative value as far as defendant is concerned. Rather obviously, the testimony and evidence complained about not only showed a conspiracy and that both defendant and Redd acted jointly in participating in the crime, but it discredited the defendant's testimony as to his whereabouts and actions during the night of the crime.

This case closely resembles our recent decision in State v. Thompson, 300 Minn. 220, 218 N. W. 2d 760 (1974). That case involved a conviction for aggravated robbery, involving three persons, all of whom were charged. At the defendant's separate trial, the state introduced certain evidence, including an in-court identification of one of the other accuseds and matching finger-prints of the third defendant. In upholding the conviction and the admission of this "coconspirator" evidence, we said that "the evidence in question was relevant evidence tending to connect defendant to the offense." 300 Minn. 222, 218 N. W. 2d 762.[7]

We also find no merit in defendant's argument that the trial court erred in permitting evidence of acts and declarations by Redd accomplished or completed prior to or after the termination of the conspiracy. The defendant's brief does not specify the declaration made by Redd prior to or after the termination of the conspiracy which it is claimed should have been excluded. We agree that statements made by a coconspirator prior to or after the conspiracy terminates are generally inadmissible. State v. Van Alstine, 305 Minn. 276, 232 N. W. 2d 899 (1975). See, also, Annotation, 4 A. L. R. 3d 671; 16 Am. Jur. 2d, Conspiracy, §§ 39, 40. (However, some courts have carved out exceptions to this broad principle. Annotation, 4 A. L. R. 3d 671, note IV.) It appears that such statements of Redd, if any were admitted, were at worst harmless error.

Defendant also claims that the following evidence was erroneously admitted: (a) Testimony concerning the clothing Redd was wearing before and after the purported time of Richardson's

---

[7] See, also, State v. Jackson, 275 Minn. 462, 147 N. W. 2d 689 (1967).

demise, (b) testimony concerning the previous purchase by Redd's wife of a sweater set which resembled that clothing and a piece of charred material found in a stove in which the state alleges the clothing worn by the murderer or murderers was burned, (c) testimony concerning the similarity of Redd's palm print with a latent palm print found on a chrome strip on a juke box at the scene of the crime, and (d) testimony concerning Redd's whereabouts on the evening before and the morning after the crime.

Acts of a coconspirator before a conspiracy begins or is terminated may stand on a different footing than declarations. In Lutwak v. United States, 344 U. S. 604, 73 S. Ct. 481, 97 L. ed. 593 (1953), the Supreme Court held it was not error to admit testimony of various acts done after the conspiracy ended, without limiting the evidence to the particular defendant who performed them, where such acts are relevant to prove the conspiracy charged.

In Lutwak, the court stated (344 U. S. 617, 73 S. Ct. 489, 97 L. ed. 603):

"It does not necessarily follow that acts and declarations made after the conspiracy ended are not admissible. In this case, the essential fact of the conspiracy was the existence of phony marriage ceremonies entered into for the sole purpose of deceiving the immigration authorities and perpetrating a fraud upon the United States. *Acts* which took place after the conspiracy ended which were relevant to show the spuriousness of the marriages and the intent of the parties in going through the marriage ceremonies were competent—such as the fact that the parties continued to live apart after they came to the United States; that money was paid the so-called wives as a consideration for their part in the so-called marrriages; and that suits were started to terminate whatever legal relationship there might have been upon the record.

"Declarations stand on a different footing. Declarations of one conspirator may be used against the other conspirator not

present on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both under a standard exception to the hearsay rule applicable to the statements of a party. *Clune v. United States,* 159 U. S. 590, 593. See *United States v. Gooding,* 12 Wheat. 460, 468-470. But such declaration can be used against the co-conspirator only when made in furtherance of the conspiracy. *Fiswick v. United States,* 329 U. S. 211, 217; *Logan v. United States,* 144 U. S. 263, 308-309. There can be no furtherance of a conspiracy that has ended. Therefore, the declarations of a conspirator do not bind the co-conspirator if made after the conspiracy has ended. That is the teaching of *Krulewitch v. United States, supra,* and *Fiswick v. United States, supra.* Those cases dealt only with declarations of one conspirator after the conspiracy had ended. They had no application to *acts* of a conspirator or others which were relevant to prove the conspiracy. True, there is dictum in *Logan v. United States, supra,* at 309, frequently repeated, which would limit the admissibility of both acts and declarations to the person performing them. This statement of the rule overlooks the fact that the objection to the declarations is that they are hearsay. This reason is not applicable to acts which are not intended to be a means of expression. The *acts,* being relevant to prove the conspiracy, were admissible, even though they might have occurred after the conspiracy ended. *United States v. Rubenstein,* 151 F. 2d 915, 917-918; see *Fitzpatrick v. United States,* 178 U. S. 304, 312-313; *Ferris v. United States,* 40 F. 2d 837, 839."

In the instant case, in order to prove the conspiracy, the state had to prove the murder, and that it had been committed by Redd and the defendant. Thus, any relevant evidence connecting Redd to the crime would tend to prove the conspiracy. The evidence was also admissible to destroy the defendant's claim that he was with Redd elsewhere, since the inference from that claim otherwise would be that defendant did not commit the crime. Furthermore, the time elements involved in this case made it necessary for the state to prove where the defendant and his accomplice

were and what they were doing from the closing of the club at 1 a. m. until the closing of the Shack at 5 to 5:30 a. m. Obviously, if Redd and defendant were someplace other than at the murder scene at the time of the murder, as defendant here claimed, they could not have committed it. The change in clothing by both Redd and defendant tended to prove the crime was committed by both and that they conspired to do it. Similarly, evidence of Redd's palm print being identical to a partial palm print in blood at the bar tended to prove the conspiracy and to defeat the defendant's claimed alibi. We hold that under the facts and circumstances of this case, the evidence concerning Richard Redd was properly admitted into evidence at this defendant's trial for the purpose of connecting defendant to the crime with which he was charged.

■ At the hearing on the motion to suppress evidence, police officers testified that after defendant's arrest on August 27, 1969, he was interrogated at the city jail for 5 to 10 minutes. After being read his Miranda rights and stating he understood them, defendant agreed to speak to the officers, answering several preliminary questions. Near the end of the interview, one of the officers told defendant that there was a witness to this incident. Defendant then replied, "That's a lie. No one could have seen us. I have nothing more to say."

At trial these statements were testified to several times by the same police officers and mentioned several times by the prosecutor in his closing argument. At the Rasmussen hearing defense counsel objected on nonconstitutional grounds to the admission of the statements. This objection was overruled and a constitutional objection was never raised. Now, defendant on appeal asserts that such testimony was an infringement on his Fifth Amendment right to remain silent since it allowed the jury to infer guilt from his refusal to speak further. State ex rel. Rasmussen v. Tahash, 272 Minn. 539, 141 N. W. 2d 3 (1965), makes it clear that admission of evidence of a prejudicial nature does not entitle a defendant to a new trial as a matter of right where

proper objection was not made at the trial level. This is true even where an objection could have been made on constitutional grounds. In the present case, however, we have considered defendant's assertion of error.

In State v. Beck, 289 Minn. 287, 183 N. W. 2d 781 (1971), where the defendant did not take the stand, we held it was error to receive evidence of an arresting officer that he had advised defendant of his right to remain silent. The testimony was not intended as a foundation for the admission of any statement by the defendant and had no probative value. Even though the officer did not testify that the defendant did indeed remain silent, we reversed the conviction. The same result and reasoning applied in State v. Roberts, 296 Minn. 347, 208 N. W. 2d 744 (1973), where the interrogating officer was allowed to testify that defendant had requested counsel when asked if he had committed the crime.

However, in State v. Combs, 292 Minn. 317, 195 N. W. 2d 176 (1972), it was held not reversible error to admit evidence of the Miranda warning where the defendant did talk to an officer after being given the warnings, and later testified on his own behalf, as here. The evidence was admitted to provide a foundation for the admission of statements made subsequent to the warning. So, also, in State v. Watts, 296 Minn. 354, 208 N. W. 2d 748 (1973), where the testimony related to defendant's initial refusal to talk.

In Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694 (1966), the United States Supreme Court held that the prosecution may not comment on or introduce evidence of defendant's exercise of his right to remain silent. Consequently, admission of the statement "I have nothing more to say" was error. We find, however, that the admission of this statement was not prejudicial. The quoted statement followed numerous other responses by the defendant in an almost unbroken sequence. In addition, the jury was informed that on two previous occasions the defendant had answered all questions put to him

by the police. Furthermore, the jury knew that after this occasion he again answered questions put to him by the police. Any impression the jury might have received from his statement "I have nothing more to say" would, in the light of all his other conversations with the police, be of little or no significance. In fact, because of his claim that he was not there, there could logically be nothing more for him to say. Considering that there was no objection to the testimony at the time, we feel that no prejudicial error was committed by admitting testimony that at the jail interrogation defendant asserted his right to silence, after having made previous statements,[8] that were lengthy, detailed, and covered practically all of his activities from 1 a. m. to 5 or 5:30 a. m. on July 4.[9]

---

[8] See, also, State v. Boykin, 285 Minn. 276, 172 N. W. 2d 754 (1969).

[9] We have carefully considered the recent case of United States v. Hale, 422 U. S. 171, 95 S. Ct. 2133, 45 L. ed. 2d 99 (1975). Hale was arrested for robbery and was advised of his right to remain silent. He made no response to an officer's inquiry as to the source of money found on his person. At his trial in the United States District Court for the District of Columbia, Hale testified, and the prosecution caused him to admit on cross-examination, that he had not offered the exculpatory information given at his trial to the police at the time of his arrest. The Supreme Court of the United States held that Hale's silence during police interrogation lacked significant probative value and under these circumstances any reference to his silence carried with it an intolerable prejudicial impact. The court carefully based its decision on the special circumstances in that case and the foundation was premised on its supervisory powers over lower Federal courts, not on constitutional grounds. The circumstances are vastly different than those in the instant case. Here the defendant did not remain silent, he answered numerous questions concerning all of his activities during the time just before and just after the approximate time of the murder. His statement that "[n]o one could have seen us—I have nothing more to say" came at the end of an interview after two prior interviews by the police. The jury could hardly feel that he had remained silent. They knew he had already told the police he was with Redd and was at a place other than the murder scene at the time of the murder. How could they have been seen if they weren't there? While we think the

■ After a review of this massive record, exceeding 4,000 pages, we conclude that there was sufficient evidence to sustain this verdict of guilty.

"* * * If the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that defendant was proven guilty of the offense charged, a reviewing court will not disturb its verdict." State v. Thompson, 273 Minn. 1, 36, 139 N. W. 2d 490, 515, certiorari denied, 385 U. S. 817, 87 S. Ct. 39, 17 L. ed. 2d 56 (1966), quoting State v. Norgaard, 272 Minn. 48, 52, 136 N. W. 2d 628, 631 (1965).

The evidence of appellant's and Redd's bloody palm prints at the scene of the murder, the Ramin wood splinters found in his car, the eyewitness account given by Patrick Perfetti, the testimony as to the change in clothing worn by defendant and Redd, all point to his involvement in this murder. No useful purpose could be served by further setting out evidence which has been set forth already in this opinion.

Regarding premeditation and intent to kill, the only thing that need be said is that the length and severe brutality of the beating which caused Richardson's death show beyond a reasonable doubt the required elements of first-degree murder set forth in Minn. St. 609.185(1). The motive of robbery was shown by the empty cash registers and the turned-out pockets of the deceased's clothing. The fact that both the defendant and Redd were well known to the murder victim also supports a verdict which required the jury to find premeditation. If robbery was the motive, the robbers obviously would not want their victim to be able to identify them. Other aspects of this case also pointed to premeditation. The verdict of guilty was justified by the evidence.

■ Defendant contends that the trial court committed reversible error by not submitting sua sponte the lesser included

---

statement, "That is all I have to say" should not have been admitted, it was not prejudicial in the circumstances of this case.

offenses[10] for the jury to consider. Although the trial judge could have instructed the jury on the lesser included offense of second-degree murder,[11] we will not disturb the verdict since the evidence reasonably supports the jury's finding of murder in the first degree. More importantly, however, in this case the defendant knowingly waived his right to have such offenses submitted, relying instead upon an "all or nothing" approach. Here the defense resisted the inclusion of lesser included offenses and the prosecutor requested that second-degree murder be submitted. Such a voluntary choice cannot now be alleged as error. Therefore, the case is distinguishable from our recent case of State v. Leinweber, 303 Minn. 414, 228 N. W. 2d 120 (1975). No error was committed in the jury instructions as submitted.

■ Appellant's final contention, not alleged as error but merely set forth for our consideration, is that he was denied a fair and impartial trial due to pretrial publicity and to numerous clashes between counsel. However, we agree with the trial court which said, in denying the motion for a change of venue, that a murder like the one in this case is naturally a newsworthy item and will be covered by the media. Within the uncertain area in which the interests in fair trial and free press must be reconciled, the media acted in a responsible manner in the reporting of this murder. From the date of the murder until defendant's arrest, the only information reported concerned the victim, his reputation, and the apparent motive. Once defendant was arrested, there was no comment by the press on the substantive evidence which could connect him to the murder. We feel that the pub-

---

[10] Second-degree murder (intentional but unpremeditated murder), Minn. St. 609.19; third-degree murder (nonintentional killing by an eminently dangerous act evincing a depraved mind, or nonintentional killing while committing a felony), § 609.195; first-degree manslaughter (intentional killing in the heat of passion or nonintentional killing committed during an act of violence), § 609.20.

[11] State v. Jordan, 272 Minn. 84, 136 N. W. 2d 601 (1965); State v. Pankratz, 238 Minn. 517, 57 N. W. 2d 635 (1953).

licity generated by this murder was not prejudicial and did not deny defendant a fair trial.

Regarding the personal conflict between the prosecutor and defense counsel, an animosity resulting in the extended length of this trial, we can only comment that such conduct was directed by each counsel at the other. The result in this case may well have been that both counsel lost the respect of the court and the jury, but this was not a situation where the animosity of a prosecutor was aimed at the defendant, resulting in prejudice. Had it been, the result here might warrant a new trial. In our view, the outbursts did not impinge upon defendant's right to a fair, dispassionate, and objective trial. Defendant's appellate counsel admits that most of the abusive conduct came from the defense counsel at trial.

Nonetheless, the gravity of the human interests at stake in a criminal trial demands that the proceedings be conducted, so far as possible, in an orderly and dignified manner. The rudeness and intemperance exhibited by officers of the court in this case go beyond the bounds of legitimate advocacy. However, taking such conduct in the context of the entire trial and weighing it against the evidence of guilt, we feel that defendant was not prejudiced to an extent that would require a new trial.

For all the reasons stated herein, the conviction is affirmed. Affirmed.