## STATE v. GARY R. WHITE.

203 N. W. 2d 852.

January 19, 1973—No. 43785.

*Robins, Meshbesher, Singer & Spence* and *Ronald I. Meshbesher,* for appellant.

*Warren Spannaus,* Attorney General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* and *David G. Roston,* Assistant County Attorneys, for respondent.

PETERSON, JUSTICE.

A jury found defendant, Gary R. White, guilty of second-

degree murder in the shooting death of John Kenneth Newton on July 4, 1971. He appeals from the judgment of conviction and the order of the district court, The Honorable Tom Bergin, Judge, denying his post-trial motion for judgment of acquittal notwithstanding the verdict or, in the alternative, for a new trial.

The motion for judgment of acquittal is wholly without merit. The jury could find under the admitted evidence that defendant did shoot the decedent, that he acted with intent to effect death, Minn. St. 609.19, and that he did not act in self-defense, § 609.065(1). Judge Bergin was of the stated opinion that it was the only verdict that could have been returned.

The alternative motion for a new trial, however, should have been granted. We are persuaded that the interests of justice warrant a new trial, not alone in the interest of this defendant but in the interest of other defendants in future trials. We are unable to conclude beyond a reasonable doubt that the reception of inadmissible evidence or the making of impermissible final argument by the prosecution did not prejudicially inhibit the fair trial demanded for so serious an indictment. We are compelled to reverse and direct the granting of a new trial.

The homicidal event occurred in the early hours of the morning in a house located in the near north side of Minneapolis. The premises were owned by a Barbara Ray and were apparently operated by her, together with James Flood, as an after-hours tippling house. Nadine Howard, serving as a cook for a party, was serving food to a black man, unknown to her but now identified as defendant, in the kitchen. She opened the outside door to admit a white man, the decedent, apparently also unknown to her. She observed that a fist-fight occurred almost immediately between the two men, but observed little else. She went to the basement, where the party of some 50 people was in progress, and there summoned Flood to the scene of the fight. Flood testified that he heard two shots as he was walking up the stairs from the basement and, upon entering the kitchen, saw defendant

shoot decedent in the thigh with a pistol as decedent lay on the floor, and he saw defendant severely beating the decedent with foot and fist. Decedent was unarmed, and no other persons were present. Flood instructed defendant to leave the premises, adjourned the party, and then called the police. Newton died at the hospital, and his death was medically attributed to two gunshot wounds in his chest and abdomen. Police found three .22-caliber bullet casings on the floor of the kitchen.

Defendant undertook to show, through witnesses other than himself, that the decedent was the probable aggressor in the altercation, and, by inference, that defendant did the fatal shooting, if he in fact did so, in self-defense. This showing was by the testimony of witnesses, some of whom knew both defendant and decedent, to the effect that defendant was an industrious businessman who did not carry guns and was not of violent disposition and that, in contrast, decedent did carry guns and had harassed and threatened defendant. The major part of the record consists of the examination and cross-examination of both state and defense witnesses on these subjects.

The nature of the defense and the prosecution's response—resulting in the most prejudicial event of the trial—were forecast in the examination of state's witness James Flood at the outset of the short trial. Counsel for defendant, in his cross-examination of Flood, asked this obviously improper question:

"And you knew, did you not, Mr. Flood, that Mr. Newton had been picked up in the past for suspicion of homicide, didn't you?"

Objection by the prosecutor was sustained. Counsel for the prosecution in redirect examination of Flood retaliated with this patently improper question:

"Are you aware that Mr. White has a criminal record?"

Objection by defense counsel was sustained. The impermissible reference to defendant's purported criminal record did not end there. Later in the trial, when defense counsel invited the prosecutor to stipulate as to decedent's criminal record, the prosecu-

tor countered that he would do so if defense counsel would "stipulate to the record of his own." Whether or not this colloquy was in earshot of the jury is unclear, but it nevertheless seems to reflect the prosecution's persistent effort to present clearly inadmissible evidence to the jury.

Other incidents in the trial, both in the examination of witnesses and in argument to the jury, of which three examples are illustrative, were prejudicial in cumulative effect. First, in purported rebuttal of defense representation of defendant as a nonviolent person, the prosecutor introduced the police record of an investigation, 8 years earlier, when defendant had brought a wounded male companion to the Minneapolis General Hospital, at which time defendant had stated they were shot at by unknown persons on the street. The report, admitted over objection, stated the opinion of the investigating police officer (who was not the witness) that defendant was "unwilling" and "belligerent" in refusing to submit to questioning. The prejudicial implication far outweighed any actual probative value of the recorded statements of opinion.[1]

Second, in an effort to refute defense representation of defendant as an industrious and legitimate businessman, the prosecutor undertook to establish that defendant was a procurer for prostitution, or pimp. He did not do so by competent evidence, but instead asked a defense witness and a prosecution rebuttal witness to confirm the prosecutor's declaration that defendant was a pimp. The witnesses denied that characterization of defendant, but this persistent interrogation, to which defendant objected, was calculated to give the jury the impression that it was nonetheless probably a fact.

---

[1] The prosecution, in like vein, elicited from a former wife of defendant that she had been granted a divorce from him on grounds of "cruelty." This fact, without more, would not fairly import that defendant had committed acts of physical violence against her. As the witness testified, she had claimed only mental cruelty, not physical cruelty.

Third, in refutation of defense testimony, itself of dubious probative value, to the effect that the decedent may have shot at defendant or his property on prior occasions, thus evincing violently aggressive acts against defendant prior to the fatal altercation, the prosecution asked Jean Henderson, a white woman, to stand up in the court room. The purpose of repeated references to Miss Henderson, who was not called as a witness, is apparent in this portion of the prosecution's final argument to which defendant duly objected:

"Incidentally, we have the name of this Jean Henderson popping in here. Recall the testimony of the manager of the apartment building where Mr. White was living. I had the young lady stand up in the back of the Courtroom. And he says, 'That's the woman. That's the one that moved in with him, the one he identified as his wife when he took the apartment.' We have the testimony of Roy Vincent from the auto body, said it was a white woman that brought the car in, the Gremlin in, and picked it up. Seemed to be in a big hurry when she left. She was apparently living in that apartment building. Just something peculiar in that testimony, isn't there? Think you would like to know what she would have to say? Maybe she was home when the gunshots were fired into the house. Maybe she knows something we don't know, something about these shootings that we would like to know about. * * *

* * * * *

"Bear in mind when you consider their testimony about all these incidents, what was he trying to hide? Where is Jean Henderson? Perhaps she can clear some of these things up.

"* * * Where is the evidence that this was a case of self defense?"

The prosecution contends that any impropriety in its interrogation and argument was precipitated by impermissible trial tactics of the defense, most strikingly evinced in the cited examination and cross-examination of witness James Flood. The

prosecution correctly observes that responsibility for a fair trial rests as much upon counsel for defendant as upon counsel for the state. It urges, with force that, if this were not the rule, the defense could with impunity engage in improper tactics, gambling for either a verdict of acquittal, from which the state has no appeal, or, in the event of a verdict of guilt, a new trial on the basis of prosecutorial misconduct which the defense itself precipitated.

The state does not suffer such handicap. First, counsel for the defense may not with impunity engage in unprofessional conduct. It is unprofessional conduct for either the prosecutor or defense counsel knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury to offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury. See, A.B.A. Standards for Criminal Justice, The Prosecution Function (Approved Draft, 1971) § 5.6(b); Id., The Defense Function (Approved Draft, 1971) § 7.5(b). Similarly, it is unprofessional conduct to ask a question which implies a factual predicate which the examiner cannot support by evidence, Id., The Prosecution Function (Approved Draft, 1971) § 5.7(d); Id., The Defense Function (Approved Draft, 1971) § 7.6(d), or intentionally to mislead the jury in argument as to inferences it may draw, Id., The Prosecution Function (Approved Draft, 1971) § 5.8(a); Id., The Defense Function (Approved Draft, 1971) § 7.8(a).

Second, and no less important, the state, as much as the defendant, has recourse to the court for appropriate admonition and rulings with regard to impermissible trial conduct. Trial courts, as we wrote in State v. Boice, 157 Minn. 374, 378, 196 N. W. 483, 484 (1923), "have ample power to keep counsel on both sides within bounds" and, indeed, "may and should interfere without waiting for an objection."

We do not, however, fault the trial court for not declaring a mistrial in the absence of a defense request to do so. We are

aware that his counsel at one point had indicated defendant would testify and that defendant subsequently elected not to do so. If defendant had testified, his criminal record, if any, might well have surfaced as impeachment of his credibility, in which case the impropriety of the prosecutor's interrogation of James Flood might have proved harmless. The hazard of the trial court's declaring a mistrial sua sponte, at least in the absence of "manifest necessity," is, as the United States Supreme Court held in United States v. Jorn, 400 U. S. 470, 91 S. Ct. 547, 27 L. ed. 2d 543 (1971), that defendant has been placed once in jeopardy and may not be subject to retrial. The rationale was stated in these words (400 U. S. 484, 91 S. Ct. 557, 27 L. ed. 2d 556):

"* * * [T]he crucial difference between reprosecution after appeal by the defendant and reprosecution after a *sua sponte* judicial mistrial declaration is that in the first situation the defendant has not been deprived of his option to go to the first jury and, perhaps, end the dispute then and there with an acquittal. On the other hand, where the judge, acting without the defendant's consent, aborts the proceeding, the defendant has been deprived of his 'valued right to have his trial completed by a particular tribunal.'" (Citation omitted.)

The trial court, therefore, as an act of discretion, should take steps short of an unrequested declaration of a mistrial, promptly to right the wrong at the time it occurs.

The prosecution's final argument concerning defendant's failure to call Jean Henderson or to produce evidence in support of his self-defense claim, in full context of the argument, illustrates the difficulty in distinguishing between the burden of proof and the burden of going forward with evidence. The distinction, at least in abstract form, is stated in 1 Wharton, Criminal Evidence (12 ed.), §§ 13, 14:

"* * * Generally the burden of proof upon any affirmative proposition necessary to be established as the foundation of an issue does not shift, but the burden of evidence or the burden of

explanation may shift from one side to the other according to the testimony. Thus, if the prosecution has offered evidence which if believed by the jury would convince them of the defendant's guilt beyond a reasonable doubt, the defendant is in a position where he should go forward with countervailing evidence if he has such evidence. He is not required to do so even though a prima facie case has been established, for the jury must still find that he is guilty beyond a reasonable doubt before they can convict. * * *

"However, the defendant's failure to present evidence in his behalf may be regarded by the jury as confirming the conclusion indicated by the evidence presented by the prosecution or as confirming presumptions which might have been rebutted. * * * This does not alter the burden of proof resting upon the prosecution.

\* \* \* \* \*

"* * * In all criminal prosecutions, without regard to the nature of the defense which the defendant may raise, the burden of proof remains at all times upon the prosecution to establish the guilt of the defendant beyond a reasonable doubt. If the defendant raises a sufficient doubt as to any material element, and the prosecution is then unable to overcome this evidence, the prosecution has failed to carry its burden of proof of the defendant's guilt beyond a reasonable doubt and the defendant must be acquitted."

We are persuaded that the quoted portion of the prosecutor's closing argument exceeded permissible limits of comment on the absence of evidence supporting a defendant's claim of self-defense.

Justice does not demand an error-free trial, for the crucial inquiry is whether, considering the record as a whole, the error was prejudicial to the result. We have in other contexts declined to reverse because of improper cross-examination of a defendant, e. g., State v. Hyleck, 286 Minn. 126, 175 N. W. 2d 163, certiorari denied, 399 U. S. 932, 90 S. Ct. 2267, 26 L. ed. 2d 803 (1970), or

because of questionable final argument, e. g., State v. Forichette, 279 Minn. 76, 156 N. W. 2d 93 (1968), State v. Comparetto, 292 Minn. 425, 193 N. W. 2d 626 (1971). The prosecutorial mistakes in such cases, even as a reaction to defense conduct, are distinguishable as more isolated occurrences and less infectious of a fair verdict by the jury. The evidence of defendant's guilt may be strong, at least in the absence of persuasive testimony by defendant himself that he acted reasonably in self-defense, but we are aware of no precedent for holding that introduction of defendant's criminal record either by declaration of the prosecutor or by testimony not impeaching the credibility of defendant as a witness—even if it were the only error in the trial—would beyond a reasonable doubt constitute harmless error.

Reversed and remanded for a new trial.