## STATE v. BERT WAYNE WILLIAMS.

210 N. W. 2d 21.

July 27, 1973—Nos. 43746, 43747.

C. *Paul Jones,* State Public Defender, and *David J. Byron,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *Robert W. Johnson,* County Attorney, and *Robert H. Scott,* Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Rogosheske, Peterson, and Kelly, JJ.

PER CURIAM.

Defendant, 32 years of age, was indicted by a grand jury of attempted first-degree murder of one police officer, attempted second-degree murder of another officer, and aggravated assault of his wife. He was convicted by a jury of attempted second-degree murder of both police officers and acquitted of aggravated assault. The trial court denied defendant's motion for a new trial and sentenced him to imprisonment for an indeterminate term of 20 years as both offenses arose out of a single behavioral incident.[1] Because we are persuaded that prosecutorial misconduct in the cross-examination of defendant and in final argument prejudiced defendant's right to a fair trial, we reverse and remand for a new trial.

With all conflicts in the evidence resolved in favor of the jury's verdict, the relevant facts established at trial may be briefly summarized. On the morning of December 24, 1971, defendant left his home after telling his wife he was about to go fishing. Instead, he ventured to a nearby landfill where a Christmas party was in progress and began to consume intoxicating liquors. Although he returned home briefly for lunch, he rejoined the party and continued his drinking. In the late afternoon, he again returned home only to be sent on a shopping errand by his wife. Before completing the errand, he again returned to the landfill

[1] Minn. St. 609.035.

for additional drinking. It was not until approximately 8 p.m. that he returned home. The record indicates domestic quarreling between defendant and his wife, and as a result, she locked all the doors and windows of their home sometime before his return in an effort to keep him from gaining entrance. His efforts to enter caused her, unknown to defendant, to call the Anoka County Sheriff's office and ask for police assistance to keep him from entering. By the time Officers Leonard Christ and William W. Erickson, Jr., arrived at the Williams residence (parking their squad car some 35 feet from the entrance), defendant had succeeded in forcing his entrance. His wife, who continued arguing with defendant as he turned his attention to their five children, failed to inform him that she had summoned the police, and as Officer Erickson approached the front door, she stepped outside to meet him. Defendant, who insists that he was unaware of the officers' presence but believed his wife had left their home for her mother's residence across the street, testified, "I said, well, if my wife can run to her mother's, I said, I can make a little noise, too." He then went to a back closet; pulled out a .16-gauge, bolt-action, clip-equipped shotgun; and broke the window portion of the front door with the barrel of the gun. Loading the gun with two rifle slug shells, he first fired in the direction of Officer Erickson, who testified he could "feel this blast go by [his] left ear and ruffle [his] hair." Officer Christ, fearing his partner and Mrs. Williams might be wounded, fired his Smith and Wesson service revolver, the bullet missing defendant and striking the exterior of the house. A second shotgun blast was then fired by defendant in Officer Christ's direction. Defendant's wife, who had been pulled down by Officer Erickson near the front doorway before the first shotgun blast, was later dragged inside by defendant who then fled through a bedroom window. He subsequently surrendered to the Anoka County authorities.

The critical fact issue disputed by the testimony was the state's claim that defendant, knowing the officers were present, shot at each of them with the intent to kill, as opposed to the evidence

supporting defendant's explanation that, unaware of the officers' presence, he discharged the shotgun twice in succession in reaction to his wife's "running off" to her mother's on Christmas Eve.

At trial, defendant testified on his own behalf, and on direct examination defense counsel requested him to disclose his prior convictions. Defendant disclosed an out-of-state conviction for burglary and a plea of guilty to a previous assault charge, both occurring in Mississippi. Chronologically, the initial claim of prosecutorial misconduct occurred when the prosecutor began to cross-examine defendant regarding his prior convictions on the basis of certain data appearing on an FBI "rap sheet." [2] An attempt to enlarge upon the two crimes was prefaced by the following:

"Q.  All right. Now, Mr. Williams, you've told us a little about your criminal history. You haven't quite been completely frank in that, either; have you?

"A.  I have been honest."

Then, although the "rap sheet" failed to so indicate, the prosecutor asked:

"Q.  On April 26, 1959, at Pascagoula, Mississippi, was there a conviction for another crime that you didn't tell us about?

"A.  I don't remember the date.

"Q.  Carrying a concealed weapon?

"A.  No.

"Q.  You deny that you were convicted of that?

"A.  Carrying a concealed weapon? No, I have never been convicted of carrying a concealed weapon, to my knowledge. I don't remember it.

---

[2] We are advised that the FBI "rap sheet" in the prosecutor's possession was merely an investigatory tool. Indicative of this is the following language appearing on its face: "* * * The notations are based on data formerly furnished this Bureau concerning individuals of the same or similar names or aliases and ARE LISTED ONLY AS INVESTIGATIVE LEADS."

"Q. Maybe if I show you this, just between you and I, you can tell us what that conviction is?

"A. No, I never—never seen it. I have never been convicted of it."

Because the "rap sheet" listed an out-of-state offense of robbery, the prosecutor continued:

"Q. All right. How about May, 1959, at Pascagoula, for the crime of Robbery?

"A. No. I was not.

"Q. Was there something that happened there, or I mean— there was no conviction? Was there a conviction for another crime then at that time, or what was it?

"A. Possible. I—I don't know. There was no conviction of no robbery there."

The prosecutor then began to explore whether the admitted assault conviction was actually far more serious:

"Q. Yes, that there was a conviction for assault.

"A. Assault and battery? Or something like this?

"Q. Well, my recollection in writing it down at the time was that counsel said: And then a few days—years later, you know, after the burglary, when you were about 18, he said, you were convicted of burglary and then a few years later there was an assault conviction. Is that what he said?

"A. I believe so, yes.

"Q. Actually, what was the charge and conviction for? Was it not assault and battery with intent to kill and murder?

"A. No."

A bench conference then took place followed by a lengthy in-chambers proceeding, at which time it was determined that defendant had indeed disclosed his only two convictions, namely, for burglary and assault. It was also revealed that the assault charge was in essence assault with a glass pop bottle, denoted as a weapon likely to cause injury or death, with intent to rob. After return to open court, defendant, admittedly confused about

the precise charge and offense to which he had once pled guilty, testified that the assault charge was assault with intent to kill and murder.[3] Defendant's motion for a mistrial was denied. ..

At the close of trial, the prosecutor began his final argument with the following comment:

"Now, you might also bear in mind who our clients are. His [defense counsel's] client is Mr. Williams * * *. Now, his interest in this case is pretty obvious. He hired [the defense counsel] for one purpose: he does not want to be convicted. This is an important case, this is a serious case. He doesn't want to be convicted, and he hired [defense counsel] for that purpose."

In addition, the prosecuting attorney offered the following comments regarding the function of the grand jury in his closing argument:

"On December 24, 1971, Mrs. Wayne Williams made a 'phone call asking for help. Deputies William Erickson, and Leonard Christ, responded to that request for help. They arrived at the Williams home, gunshots were fired. *The grand jury of this county made an investigation* into the circumstances surrounding that incident; they returned an indictment—they returned two indictments. *They said that the defendant committed the crime of attempted first degree murder on the person of William Erickson; they said that he committed an assault upon Mrs. Williams; they said that the defendant committed the crime of attempted second degree murder on the person of Leonard Christ.* That

---

[3] The most significant discrepancy evidence concerning these 13-year-old offenses from even a cursory reading of the "rap sheet" is its failure to indicate a conviction for the out-of-state charge of carrying a concealed weapon. A similar discrepancy emerges as the FBI-compiled data would indicate defendant was previously indicted in Mississippi for assault and battery with intent to kill and murder. A certified copy of that out-of-state indictment obtained after trial, however, characterizes the assault as one "with a means of force likely to produce death, to-wit: a glass pop bottle, with the felonious intent * * * [to] commit robbery."

brought this case before you. And it's now going to be your job to determine whether or not the charges and allegations of the grand jury are true." (Italics supplied.)

Regarding the relationship between the grand jury and the presumption of innocence, the prosecutor concluded:

"* * * [This] means simply that the fact that the grand jury said that this defendant committed these crimes is not to be taken by you to mean that he did. He comes in here presumed to be innocent. But that is a shield, this presumption of innocence, to protect the innocent; it's not a cloak behind which the guilty may hide. And so once the State establishes or presents evidence that establishes the guilt of the defendant in your mind, that shield is removed, he no longer is entitled to its protection."

Finally, the prosecuting attorney offered the following remarks concerning defendant's wife:

"All right, we then spent some time and used up some of your time in attempting to show that Mrs. Williams—and I'm sorry. *As I say, I have been making final arguments for 16 years, and I can't remember ever using this word before in a final argument—lied. She lied to you.* She said about all her efforts to give a statement. Why? I don't know what the purpose of it is, or was. That she tried to give a statement. *But she lied when she said it.* We called before you the witnesses, and I had to even call each and every secretary in my office. *Is there any question that she lied to you when she said that?*" (Italics supplied.) [4]

Defense counsel in his summation attempted to clarify for the

---

[4] The record reveals that after defendant's indictment, his wife called upon the prosecutor prior to trial to give a statement. She claimed, however, that she was precluded from meeting with the prosecutor and thereby effectively barred from offering her account of the events which had transpired. The prosecutor's conclusion that defendant's wife lied arises from his calling members from the county attorney's office staff to testify that defendant's wife made no such appearance at his office.

jurors the precise function of the grand jury. After declaring that neither defendant nor any of those testifying on his behalf appeared before the grand jury for presentation of their version of the facts, he continued and the following occurred:

"* * * In the indictment, the grand jury hasn't said we believe beyond a reasonable doubt that these people committed this crime but it's merely probable cause.

"[Prosecutor]: Your Honor, that's not a correct statement. The grand jury is bound to find that on the basis of the evidence presented it's beyond a reasonable doubt.

"THE COURT: Well, the grand jury indictment is a mere accusation.

"[Prosecutor]: Well, but, Your Honor, he stated what the grand jury must find. And I would request the Court instruct the jury as to what they must find.

"THE COURT: I will instruct the jury as to what—the mere accusation. That's all."[5]

Since the evidence is clearly sufficient to support defendant's conviction of attempted second-degree murder of Officer Erickson, and to a lesser degree of Officer Christ, we have searched the record in vain for any basis to support a conclusion that the claimed misconduct of the prosecutor did not prejudice the substantial rights of defendant. Yet the record, with due allowances for the tendency to overemphasize when quoting selected parts out of context, speaks for itself.

In recognition of the ever-increasing debate concerning statutes similar to Minn. St. 595.07 authorizing prior-crime im-

---

[5] Although the general language of the court's charge correctly characterized the accusatory nature of a grand jury indictment, no specific references to the prosecutor's clearly inaccurate and misleading references to the function of the grand jury were requested by defense counsel or included in the charge. State v. Iosue, 220 Minn. 283, 19 N. W. 2d 735 (1945); State v. Kasherman, 177 Minn. 200, 224 N. W. 838, certiorari denied, 280 U. S. 602, 50 S. Ct. 85, 74 L. ed. 647 (1929).

peachment evidence,[6] we have cautioned that such impeaching cross-examination of an accused must be limited to the fact of conviction, the nature of the offense, and the identity of defendant. State v. Norgaard, 272 Minn. 48, 136 N. W. 2d 628 (1965). Such limitations necessarily prohibit the asking of a question relating to prior conviction which implies the existence of a certified record of a valid conviction which the cross-examiner knows or should know he does not have to offer to rebut a denial. Since the "rap sheet" relied upon failed to provide a factual predicate for the cross-examination pursued, the questions asked concerning nonexistent convictions were both improper and prejudicial.[7]

---

[6] See, State v. Cote, 108 N. H. 290, 235 A. 2d 111 (1967), certiorari denied, 390 U. S. 1025, 88 S. Ct. 1412, 20 L. ed. 2d 282 (1968); Luck v. United States, 121 App. D. C. 151, 348 F. 2d 763 (1965); State v. West, 285 Minn. 188, 173 N. W. 2d 468 (1969); People v. Farrar, 36 Mich. App. 294, 193 N. W. 2d 363 (1971); State v. Santiago, 53 Hawaii 254, 492 P. 2d 657 (1971); Ashton v. Anderson, 279 N. E. 2d 210 (Ind. Sup. Ct. 1972); People v. Montgomery, 47 Ill. 2d 510, 268 N. E. 2d 695 (1971); Note, 70 Yale L. J. 763; Note, 36 Minn. L. Rev. 724, 736; Ladd, *Credibility Test— Current Trends,* 89 Pa. L. Rev. 166; Griswold, *The Long View,* 51 A. B. A. J. 1017, 1021; Schaefer, *Police Interrogation And Privilege Against Self-Incrimination,* 61 Nw. U. L. Rev. 506; Rule 609, Rules of Evidence for United States Courts and Magistrates, U. S. Code Serv. L. ed., Jan. 1973.

[7] In accord, see 6 Wigmore, Evidence (3 ed.) § 1808(2), and those decisions holding that a prosecutor may not attempt to impeach a witness through disclosure of prior convictions unless he is prepared and able to prove such convictions in the event of the witness' denial. Ciravolo v. United States, 384 F. 2d 54 (1 Cir. 1967); United States v. Semensohn, 421 F. 2d 1206 (2 Cir. 1970); People v. Sanza, 37 App. Div. 2d 632, 323 N. Y. S. 2d 632 (1971); People v. Perez, 58 Cal. 2d 229, 23 Cal. Rptr. 569, 373 P. 2d 617 (1962); People v. Rahar, 37 Mich. App. 577, 195 N. W. 2d 77 (1972). The authorities support A. B. A. Standards for Criminal Justice, The Prosecution Function, § 5.7(d) (Approved Draft, 1971), which provides: "It is unprofessional conduct to ask a question which implies the existence of a factual predicate which the examiner knows he cannot support by evidence." See, also, A. B. A. Code of Professional Responsibility (adopted Aug. 4, 1970, 286 Minn. ix) DR 7-106(C)(1); State v. White, 295 Minn. 217, 223, 203 N. W. 2d 852, 857 (1973).

In measuring the prejudicial effect of the foregoing, we cannot ignore the prosecutor's inaccurate and misleading argument concerning the proper role and function of the grand jury and of defense counsel, and the injection of his personal opinion as to the veracity of defendant's wife, however unwittingly those assertions in final argument may have been prompted by over-zealousness because of the gravity of the charged offense against law enforcement officers. We find it difficult to believe that the jury's ability to consider the testimony in a detached and objective manner was not affected by the implications of the final argument (1) that defense counsel's role and function was less an essential component of the administration of criminal justice than the role and function of the prosecutor—in view of the fundamental that defense counsel, as an officer of the court, is obliged to serve the accused as his counselor and advocate "with courage, devotion and to the utmost of his learning and ability" in order to protect against any conviction, however overwhelming the evidence of guilt, save one based upon strict adherence to both procedural and substantive rules of law;[8] (2) that the grand jury "investigation" and indictment was more than a mere accusation—especially when the offense could have been charged by a prosecutorial information;[9] and (3) that defendant's wife lied to the jury—contrary to the well-established prohibition against injecting counsel's personal opinion concerning the

---

[8] A. B. A. Standards for Criminal Justice, The Defense Function, § 1.1(a,b). See also the commentary to those sections, which states in part: "* * * [T]he defense counsel is to be viewed as one of the three major participants along with judge and prosecutor. * * * The adversary system requires his presence and his zealous professional advocacy just as it requires the presence and zealous advocacy of the prosecutor and the constant neutrality of the judge. Defense counsel should not be viewed as impeding the administration of justice simply because he challenges the prosecution, but as an indispensable part of its fulfillment, and this view should underlie the attitudes of the other participants and the standards governing his own conduct."

[9] Minn. St. 628.29.

veracity of a witness during closing argument.[10] We are persuaded that the cumulative effect of the misconduct enumerated was prejudicial and cannot be regarded as harmless beyond a reasonable doubt. Accordingly, defendant must be granted a new trial.

Reversed and remanded for a new trial.

MR. JUSTICE GILLESPIE took no part in the consideration or decision of this case.

MR. JUSTICE YETKA and MR. JUSTICE SCOTT, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

[10] State v. Prettyman, 293 Minn. 493, 198 N. W. 2d 156 (1972); State v. Jones, 277 Minn. 174, 152 N. W. 2d 67 (1967); State v. Perry, 274 Minn. 1, 142 N. W. 2d 573 (1966); State v. Schwartz, 266 Minn. 104, 122 N. W. 2d 769 (1963). See also A. B. A. Standards for Criminal Justice, The Prosecution Function, § 5.8(b) (Approved Draft, 1971), which provides: "It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." See, also, A. B. A. Code of Professional Responsibility (adopted Aug. 4, 1970, 286 Minn. ix) DR 7-106(C)(4).