STATE v. WARREN EARL JOHNSON.

239 N. W. 2d 239.

February 13, 1976—No. 45311.

C. Paul Jones, State Public Defender, and Mark W. Peterson, Assistant State Public Defender, for appellant.

Warren Spannaus, Attorney General, Gary W. Flakne, County Attorney, and Vernon E. Bergstrom, David W. Larson, and Michael McGlennen, Assistant County Attorneys, for respondent.

Heard before Sheran, C. J., and Rogosheske, Yetka, and Amdahl, JJ., and considered and decided by the court en banc.

Per Curiam.

This is an appeal from a judgment of the Hennepin County District Court convicting defendant of murder in the second degree and aggravated robbery. We affirm.

Defendant was indicted November 27, 1973, along with two other men, Everett Banham and Edo Walker, for the October 13, 1973, murder of Woodrow Kipp, a driver for the Yellow Cab Company of Minneapolis.

Codefendant Banham testified that he happened to run into defendant on the evening of the Kipp killing at a bar in downtown Minneapolis, where the defendant invited him to attend a party at 3715 Second Avenue South. Upon arriving at the party, both he and de-

fendant went inside. Banham came outside after a short time, and stood outside talking to people until defendant joined him approximately one hour later, with Edo Walker joining them a short time thereafter. After they had stood around talking for awhile, defendant suggested that they "rip off" a cab driver.

Approximately 5 minutes after defendant made the suggestion, a yellow cab drove up, and parked in front of 3721 Second Avenue South. The driver got out and went to the door of 3721 Second Avenue South. Mrs. Ruby Tucker, the occupant, was awakened by the sound of her doorbell. She observed a man standing at her front door and a cab parked in front of her house. The man was "evidently a driver." She went to get a housecoat in order to open the door and inform the driver that no cab had been called. Before she could return, the driver returned to his cab.

Banham, Walker, and defendant met Kipp, the driver, on the sidewalk as he returned to his cab. Someone asked him for his money at this time, but he kept walking around his cab to the driver's side. The three continued to follow him, defendant in the lead, and before the driver reached the door, defendant grabbed him and started wrestling with him. Kipp managed to push defendant away, who then reached inside his jacket and took something out and hit the driver in the face with it. Defendant then pushed Kipp away and pointed whatever was in his hand at Kipp, whereupon Banham said, "Don't shoot. Leave him alone," assuming that defendant had a gun in his hand. Banham then started walking away, hearing a shot fired about 5 second later but not looking back. He had not seen defendant with a gun that evening, and as there were between five and ten people standing on the street, Banham testified it was possible someone else fired the shot.

Banham met defendant at the latter's car. They drove past the scene of the shooting, and then proceeded to defendant's mother's house, where Banham and defendant changed clothes. Banham was then taken home.

Jackie Ellis, who had also been present at the party at 3715 Second Avenue South, testified that she had been outside talking with defendant, Walker, and Banham. She testified that defendant discussed the arrival of the cab, stated that he needed some money, and was not dissuaded by Ms. Ellis' suggestion that it would not be worth the trouble to bother the driver. She then saw the three run down to the cab driver, saw defendant struggle with him, and then heard some shots go off. She then heard someone say, "You damn fool, you didn't have to shoot him," and then saw the three run from the scene. She testified the

flash accompanying the firing of the gun came from where defendant was standing, although she never saw him with a gun at any time during the evening.

On November 17, 1973, Minneapolis officers Stanley Capistrant and Neil Brodin stopped a car in North Minneapolis for traffic violations. As a result defendant and another passenger, Bernadine Anderson, were arrested. A search of Ms. Anderson's purse revealed a .32 caliber Walther PPK, a semi-automatic pistol, later identified as the murder weapon. She testified that defendant had given her the gun at the time the car was stopped, but was unable to identify it at trial.

Officer Capistrant seized the gun. However, he did not mention it in any arrest report. He made a property inventory, but destroyed it. Instead of handling the gun properly, he intended to keep it and locked it in his locker.

The gun's existence did not come to the prosecutor's attention until January 30, 1974, the date of the Rasmussen hearing. Capistrant was questioned about the gun, but continually asserted he had property inventoried it. Captain Robert Finn of the North Side Precinct was informed of the gun's existence and that it was missing and was perhaps at his precinct. He called Sergeant Robert Roach, informed him of the problem, and asked him to try and locate it. The Sergeant checked the property room, read the arrest reports, and asked Officer Brodin about the details of the incident. Brodin confirmed the presence of a weapon during the incident and Capistrant's handling of it. Sergeant Roach procured a duplicate key for Capistrant's locker, opened the locker, removed the weapon, and gave it to Captain Finn. Finn locked it in his desk drawer.

The next day, after deciding to turn the weapon in to Captain Finn, Capistrant went to the North Side Station. He entered the Captain's office and informed him he had the weapon. The Captain said, "No, you don't. I have it in my drawer." Whereupon, the Captain returned the weapon to Capistrant. Capistrant immediately went down to the courthouse, saw Deputy Chief William Quinn, and property inventoried the weapon.

Defendant admitted that when he was arrested on November 17, 1973, he had a gun in his possession, which he had purchased at a crap game on October 20, approximately a week after the incident involved and a day before his birthday. He testified that although the weapon introduced into evidence was similar to the one he had purchased, there were significant differences and he did not believe that it was the same one.

Defendant testified that as he walked out of the party at approximately 2:30 a. m., one taxicab was just pulling away and another was pulling up, further down the street. As he was walking toward his car, some people whom he did not know ran past him, just as the cab driver was coming to the curb. Three men then approached the driver, grabbing him and asking for his money. The driver got loose and ran to the door of the cab, and defendant then heard a shot, causing him to run for his car. Banham, with whom he had come to the party, met him at his car, and the two drove past the scene of the shooting, seeing the cab driver lying on the ground. He denied having anything to do with either the shooting or the robbery.

The issues raised on appeal by defendant are:

(1) Did the trial court abuse its discretion in determining that a sufficient "chain of custody" had been established in order to admit the murder weapon into evidence?

(2) Was the defendant denied a fair trial by publicity during the course of the trial reporting that threats had allegedly been made against prosecution witnesses, which one juror admitted reading but the balance of the jurors denied reading?

(3) Was alleged prosecutorial misconduct prejudicial to the verdict?

1. The defendant contests only that part of the "chain of custody" when the murder weapon was in the possession of Officer Capistrant. That link, he urges, is insufficient for two reasons: (1) Officer Capistrant failed to follow proper inventory procedures, and (2) he repeatedly lied to his superiors and the prosecuting attorney about his possession of the weapon.

The "chain of custody" rule, requiring the prosecution to account for the whereabouts of physical evidence connected with a crime from the time of its seizure to its offer at trial, serves the dual purpose of demonstrating that (1) the evidence offered is the same as that seized, and (2) it is in substantially the same condition. It insures that the items seized have not been exchanged for others more incriminating, and that they have not been contaminated or altered. State v. Winston, 300 Minn. 314, 219 N. W. 2d 617 (1974); State v. Lunsford, 204 N. W. 2d 613 (Iowa, 1973); State v. Simmons, 57 Wis. 2d 285, 203 N. W. 2d 887 (1973).[1]

There can be no rigid formulation of what showing is necessary in order for a particular item of evidence to be admissible. Rather, admissibility must be left to the sound discretion of the trial judge. State v.

---

[1] See, generally, McCormick, Evidence (2 ed.) § 212, p. 527; 7 Wigmore, Evidence (3 ed.) § 2129.

Winston, *supra*; United States v. Brown, 482 F. 2d 1226 (8th Cir. 1973); Gallego v. United States, 276 F. 2d 914 (9th Cir. 1960); State v. Lunsford, *supra*; State v. Simmons, *supra*. He must be satisfied that, in all reasonable probability, the item offered is the same as the item seized and is substantially unchanged in condition. United States v. Brown, *supra*; State v. Lunsford, *supra*; State v. Simmons, *supra*; People v. Beamon, 50 Mich. App. 395, 213 N. W. 2d 314 (1973).

Admissibility should not depend on the prosecution negativing all possibility of tampering or substitution, but rather only that it is reasonably probable that tampering or substitution did not occur. Contrary speculation may well affect the weight of the evidence accorded it by the factfinder but does not affect its admissibility. Gallego v. United States, *supra*; State v. Lunsford, *supra*; People v. King, 58 Mich. App. 390, 228 N. W. 2d 391 (1975).

The issue raised here does not concern the condition of the offered evidence but only whether the .32 caliber semi-automatic offered and admitted at trial was the same weapon seized by Officer Capistrant from the purse of Bernadine Anderson.

The prosecution *did* account for the whereabouts of the weapon from the time of its seizure to its offer at trial. The problem is whether to credit the testimony of Officer Capistrant, a question which affects the weight of the evidence and is properly left to the factfinder. Certainly his conduct was reprehensible.

While the weapon is certainly not so unique as not to require a showing of some chain of custody, Officer Capistrant's conduct does not bear so materially on whether the weapon offered was the one seized as to render the trial court's determination that it was reasonably probable that it was the same one an abuse of discretion.

2. The defendant made two separate motions for mistrial based on the contents of three articles which appeared in the Minneapolis newspapers during the course of the trial. The first article appeared in the Minneapolis Star March 1, 1974, the afternoon of the second day of testimony. Those portions of the first article to which defendant objects on appeal are:

"While armed bailiffs and plainclothes detectives stood guard, 19-year-old Everett Banham testified yesterday against an old friend accused of murdering a Yellow Cab Co. driver.

\* \* \* \* \*

"Courtroom security is tight because of threats allegedly made against Banham and other potential prosecution witnesses in Johnson's trial. All spectators were searched before entering the courtroom."

The other two articles appeared in the Minneapolis Tribune, March 2, 1974, and the Minneapolis Star of the same date. The portions objected to are the last paragraph of the Tribune article:

"Earlier yesterday, defense attorney Daniels moved for a mistrial because of reports published in the Minneapolis Star regarding security precautions at the trial. Judge Donald Barbeau, after asking jurors whether they had read the story, denied the motion. The trial continues Monday."

and the last three paragraphs of the Star article:

"Also yesterday, Judge Donald T. Barbeau denied a motion by defense attorney James Daniels asking a mistrial because a juror admitted reading a news account of the trial in yesterday's Minneapolis Star.

"The article mentioned the fact that spectators were searched before entering the courtroom Thursday because of alleged threats made against potential prosecution witnesses.

"Barbeau said he denied the motion because he is 'confident' that the jurors will follow his instructions to disregard news reports on the case."

Defendant argues that the prejudice in these articles is that if jurors are exposed to them, they will conclude that regardless of the defendant's guilt or innocence of the crimes charged, he, based on the alleged threats, is a dangerous person and must be convicted in the interests of public safety.

One juror admitted reading the article which appeared in the newspaper on March 1, 1974, reporting the alleged threats. Part of the trial court's reason for not excusing the juror who had read the article was that the trial was only in its second day, it appeared it would be lengthy, and he had impanelled only one alternate juror. With a weekend intervening and a potentially lengthy trial, he did not wish to run the risk of having to call a mistrial because a juror became ill or otherwise incapacitated during the balance of the trial.

The conduct of the trial court upon learning of the publicity was to immediately poll the jury to determine their exposure to the publicity. He explained to them the reason why it was necessary to avoid exposure to news media accounts of the trial and admonished them to avoid such exposure. He questioned the juror who had read the article at length in order to establish to the court's satisfaction that he had not been prejudiced or biased by the article, and specifically instructed him that he was not to give any consideration to the article in deliberating

upon the case. His general admonition was repeated at the close of testimony each day thereafter. We thus do not find reason to reverse the trial court on this issue.[2]

---

[2] See, Rule 26.03, subds. 8 and 9, Rules of Criminal Procedure, where we adopted some of the procedure set forth in the following ABA Standards for Criminal Justice relating to Fair Trial and Free Press:

"3.5  Conduct of the trial.

"It is recommended that the following standards be adopted in each jurisdiction to govern the conduct of a criminal trial when problems relating to the dissemination of potentially prejudicial material are raised.

\* \* \* \* \*

"(e)  Cautioning jurors.

"In any case that appears likely to be of significant public interest, an admonition in substantially the following form shall be given before the end of the first day if the jury is not sequestered.

"During the time you serve on this jury, there may appear in the newspapers or on radio or television reports concerning this case, and you may be tempted to read, listen to, or watch them. Please do not do so. Due process of law requires that the evidence to be considered by you in reaching your verdict meet certain standards—for example, a witness may testify about events he himself has seen or heard but not about matters of which he was told by others. Also, witnesses must be sworn to tell the truth and must be subject to cross-examination. News reports about the case are not subject to these standards, and if you read, listen to, or watch these reports, you may be exposed to misleading or inaccurate information which unduly favors one side and to which the other side is unable to respond. In fairness to both sides, therefore, it is essential that you comply with this instruction.

"If the process of selecting a jury is a lengthy one, such an admonition shall also be given to each juror as he is selected. At the end of each subsequent day of the trial, and at other recess periods if the court deems necessary, an admonition in substantially the following form shall be given:

"For the reasons stated earlier in the trial, I must remind you not to read, listen to, or watch any news reports concerning this case while you are serving on this jury.

"(f)  Questioning jurors about exposure to potentially prejudicial material in the course of the trial; standard for excusing a juror.

"If it is determined that material disseminated during the trial goes beyond the record on which the case is to be submitted to the jury and

3. Defendant's claim of prosecutorial misconduct is based on the examination of two police officers. One question dealt with whether a codefendant indicated to the officer that he was willing to testify against defendant or not. While improper, the question was never answered.

---

raises serious questions of possible prejudice, the court may on its own motion or shall on motion of either party question each juror, out of the presence of the others, about his exposure to that material. The examination shall take place in the presence of counsel, and an accurate record of the examination shall be kept. The standard for excusing a juror who is challenged on the basis of such exposure shall be the same as the standard of acceptability recommended in section 3.4(b), above, except that a juror who has seen or heard reports of potentially prejudicial material shall be excused if reference to the material in question at the trial itself would have required a mistrial to be declared."
The standard of acceptability referred to in section 3.5(f) provides:

"(b) Standard of acceptability.

"Both the degree of exposure and the prospective juror's testimony as to his state of mind are relevant to the determination of acceptability. A prospective juror who states that he will be unable to overcome his preconceptions shall be subject to challenge for cause no matter how slight his exposure. If he has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his judgment will be affected, his acceptability shall turn on whether his testimony as to impartiality is believed. If he admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows unequivocally that he can be impartial. A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to his testimony as to his state of mind."

Should the question of juror exposure to potentially prejudicial material during the course of a trial arise subsequent to the return of a verdict, the following procedure should be followed:

"3.6 Setting aside the verdict.

"It is recommended that, on motion of the defendant, a verdict of guilty in any criminal case be set aside and a new trial granted when-

The second question objected to was one directed to Lieutenant Russell Krueger relating to his questioning of defendant. The question is as follows:

"Q. Now, did you inform him that you had spoken with several people at the scene who had said that he in fact had done the shooting?"

There is some doubt whether this second question was even improper to begin with. The question was one of a series of questions which elicited the substance of an interview with defendant following his arrest. It was foundational in that it helped to explain defendant's response to a question by Lieutenant Krueger. Without the question, defendant's response would have made little sense.

The mere fact that prosecutorial misconduct has occurred during the course of a trial does not, in and of itself, require a new trial. In State v. White, 295 Minn. 217, 225, 203 N. W. 2d 852, 858 (1973), this court stated:

"Justice does not demand an error-free trial, for the crucial inquiry is whether, considering the record as a whole, the error was prejudicial to the result * * * infectious of a fair verdict by the jury."

The standards against which prosecutorial misconduct is to be judged were elaborated on in State v. Caron, 300 Minn. 123, 127, 218 N. W. 2d 197, 200 (1974):

"'* * * The test of determining whether prosecutorial misconduct was harmless depends partly upon the type of misconduct with which we are dealing. That is, the more serious the misconduct, the more certain of its effect this court has felt that it should be before labeling the error harmless. Thus, in cases involving unusually serious prosecutorial misconduct this court has required certainty beyond a reasonable doubt that the misconduct was harmless before affirming. * * * On the other hand, in cases involving less serious prosecutorial misconduct

ever, on the basis of competent evidence, the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to an extrajudicial communication of any matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury. Nothing in this recommendation is intended to affect the rule in any jurisdiction as to whether and in what circumstances a juror may impeach his own verdict or as to what other evidence is competent for that purpose."

this court has applied the test of whether the misconduct likely played a substantial part in influencing the jury to convict."

In the cases cited by defendant where this court has reversed convictions based on prosecutorial misconduct, the record disclosed repeated instances of prosecutorial misconduct, not simply isolated occurrences, and the misconduct included improperly calling to the attention of the jury the defendant's criminal background and bad character. State v. Martin, 297 Minn. 359, 211 N. W. 2d 765 (1973); State v. Williams, 297 Minn. 76, 210 N. W. 2d 21 (1973); State v. Sharich, 297 Minn. 19, 209 N. W. 2d 907 (1973); State v. White, *supra.*

Affirmed.