*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1803**

State of Minnesota,
Respondent,

vs.

Richard Ellis Hill,
Appellant

**Filed November 24, 2014
Affirmed
Worke, Judge**

Dakota County District Court
File No. 19HA-CR-10-1409

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Phillip D. Prokopowicz, Chief Deputy Attorney, Hastings, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Charles F. Clippert, Special Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Worke, Presiding Judge; Johnson, Judge; and Reyes, Judge.

UNPUBLISHED OPINION

**WORKE**, Judge

Appellant challenges his first-degree controlled-substance-crime conviction, arguing that the district court improperly admitted evidence, that he was denied due process, and that the evidence was insufficient to sustain his conviction. We affirm.

**FACTS**

On April 20, 2010, a confidential informant (CI) paid $950 for two bags of a crystalline substance, purportedly methamphetamine, from appellant Richard Ellis Hill and another individual. Hill and his companion were immediately arrested and officers searched them and their vehicle. Officers found small baggies containing a crystalline substance, money, and drug paraphernalia. Officers seized two baggies of a crystalline substance (marked as evidence numbers 5 and 7) in addition to the two baggies surrendered by the CI (collectively marked as evidence number 9, but individually as 9a and 9b). The items were placed in a secure evidence locker.

The following day an evidence technician, Ronald Gjorvad, weighed the contents of each individual bag and performed preliminary Narcotics Identification Kit (NIK) testing on samples from each bag. Samples from all four bags tested positive for methamphetamine. Gjorvad did not note any signs of tampering or cross-contamination before heat-sealing the bags and returning them to the evidence locker.

Later that day, Gjorvad brought the evidence to the Saint Paul police department crime lab. A crime lab employee received the bags, signed a transfer-of-custody form, logged the transfer in their computer system, and deposited the bags into a bin for

incoming drug cases. She did not inspect the seals on the bags, but did not alter the evidence in any way. A criminalist at the crime lab then performed analysis on the four bags, adhering to her normal testing procedure. After all items were processed and resealed, they were placed in a vault in the lab. The criminalist noted that while bag 9a was not completely heat-sealed, the zip-lock seal was secure and there was no evidence of contamination.

On April 29, 2010, the evidence was returned to Gjorvad, who stored the items in a secure property room until August 6, 2012, when the evidence was transferred to the Minnesota Bureau of Criminal Apprehension (BCA). The evidence was received by the BCA, logged, and placed in a vault. On September 19, 2012, Sara Goldstrand, a forensic scientist with the BCA, tested the items according to her normal procedure. Preliminary testing was positive for methamphetamine, and Gas Chromatography/Mass Spectrometry (GCMS) testing indicated the presence of methamphetamine. Gjorvad picked up the items on September 27, 2012, and stored them in a secure property room until Hill's trial.

The net weight of each item of evidence as recorded by the three testers followed a predictable pattern, with one exception. While three of the four bags reduced in weight following each test,[1] bag number 5 indicated the following weights: .47 grams when first tested, then .45 grams, and finally .452 grams.

---

[1] For example, bag 9a weighed 7.31 grams when tested by Gjorvad, 7.26 grams when tested at the lab, and 7.207 grams when tested at the BCA.

Hill was charged with first- and second-degree aiding and abetting the sale of a controlled substance and fifth-degree possession of a controlled substance. The matter was tried before the district court.

Goldstrand testified that she performed GCMS analysis on 9a and found that it contained methamphetamine. She testified that the preliminary analysis of 9b indicated the presence of methamphetamine and that 9b weighed 4.818 grams. Goldstrand testified that 9a and 9b had a combined weight of 12.025 grams and contained methamphetamine. The district court found Hill guilty of the first-degree charge and dismissed the remaining charges. This appeal followed.

**D E C I S I O N**

*Evidence admission*

Hill first argues that the district court erroneously applied the chain-of-custody standard in addition to the second prong of the *Frye-Mack* test in admitting the controlled substances. Appellate courts review de novo whether the correct legal standard was applied in determining the admissibility of evidence. *See State v. MacLennan*, 702 N.W.2d 219, 230-31 (Minn. 2005) (discussing whether *Frye-Mack* is the correct standard applied to the admissibility of expert "syndrome" evidence).

Under *Frye-Mack*, new or novel scientific evidence may be admissible when (1) it is shown to be generally accepted in the scientific community, and (2) the particular evidence from the technique has a foundation that is scientifically reliable. *State v. Roman Nose*, 649 N.W.2d 815, 818 (Minn. 2002). The parties do not contend that GCMS testing is new or novel. *See id.* at 819 (stating that the first *Frye-Mack* prong

4

deals with new or novel scientific techniques). "When the scientific technique that produces the scientific evidence is no longer novel or emerging, then the pretrial hearing should focus on the second prong of the *Frye-Mack* standard." *Id.*

Chain of custody "serves the dual purpose of demonstrating that (1) the evidence offered is the same as that seized, and (2) it is in substantially the same condition. It insures that the items seized have not been exchanged for others more incriminating, and that they have not been contaminated or altered." *State v. Johnson*, 307 Minn. 501, 504, 239 N.W.2d 239, 242 (1976). Admissibility does not depend on negating "all possibility of tampering or substitution," but is governed by a reasonable probability that tampering or substitution did not occur. *Id.* at 505, 239 N.W.2d at 242. "Contrary speculation may well affect the weight of the evidence accorded it by the factfinder but does not affect its admissibility." *Id.*

Hill argues that under the second prong of *Frye-Mack* the controlled substances lack foundational reliability because they were handled by the crime lab.[2] But while the crime lab handled the evidence for a period of time, no testing results from the crime lab were offered or admitted into evidence. Because the evidence was first handled by several parties and then tested using a scientific technique, the district court correctly concluded that both the second prong of *Frye-Mack* and the chain-of-custody standard apply. The former applies because GCMS testing is a scientific technique that produced

---

[2] The Saint Paul crime lab was temporarily shut down in July 2012 due to concerns that it did not adhere to proper procedures when performing drug testing. Madeleine Baran & Jon Collins, *St. Paul Police Chief Suspends Crime Lab Drug Testing*, MPRnews (July 19, 2012, 7:20 AM), http://www.mprnews.org/story/2012/07/18/news/washington-county-stops-using-stpaul-crime-lab.

evidence in this case; the latter because it must be shown that the controlled substances were not altered or contaminated prior to testing.

Hill argues that even if the chain-of-custody standard is proper, the chain of custody was inadequate, and the evidence was inadmissible, because there is "definitive proof of alteration or substitution" of the substances when handled by the crime lab. "Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003).

Hill asserts that one of the bags of methamphetamine gained weight from the time it was measured at the crime lab to the time it was measured at the BCA. The weight went from .45 grams to .452 grams, despite a small sample being taken at the crime lab. The record does not support Hill's claim that this slight discrepancy shows a breach in the chain of custody. The crime lab measured to the one-hundredth of a gram; the BCA measured to the one-thousandth. Additionally, there may have been varying calibration of one of the scales by a one-hundredth of a gram or less. Regardless, because chain of custody is the applicable standard at the weighing stage of the evidence-handling process, any issues go to the weight of the evidence, not admissibility. The district court properly applied the chain-of-custody standard and the second *Frye-Mack* prong, and did not abuse its discretion in admitting the evidence.

### *Due process*

Hill next argues that he was denied due process of law because his trial was unfair. "Defendants have a due process right to a fair trial and a defendant is entitled to a new

6

trial if the errors, when taken cumulatively, had the effect of denying [a defendant] a fair trial." *State v. Sanchez-Diaz*, 683 N.W.2d 824, 835 (Minn. 2004) (quotation omitted) (brackets in original).

Hill asserts that the state: (1) created a system of testing controlled substances at the crime lab that lacked scientific procedures or protocols; (2) failed to show that the crime lab complied with standards and controls; (3) should have known about, and disclosed, the problems at the crime lab; and (4) established a system of processing evidence at the crime lab that improperly tracked evidence, thereby preventing a defense challenge to the evidence.

Hill's first two allegations essentially repackage his evidence-admission argument as a due-process argument—the mismanaged crime lab tainted the controlled substances, which was a fundamentally unfair trial practice denying due process. Because we have concluded that the district court properly admitted the evidence, we similarly conclude that there was no due-process violation. *See State v. Fulford*, 290 Minn. 236, 238-39, 187 N.W.2d 270, 272-73 (1971) (concluding that evidence determined to be properly admitted did not violate defendant's right to due process).

Hill's contention regarding lack of prosecutorial disclosure has no support in the record and was not argued below; thus, this claim will not be considered on appeal. *State v. Wilson*, 594 N.W.2d 268, 271 (Minn. App. 1999), *review denied* (Minn. Aug. 18, 1999).

Hill lastly argues that the manner in which the crime lab was run denied him meaningful review and cross-examination. "Due process requires that the defense have

7

the same amount of information as the prosecution . . . so that the defense is able to adequately cross-examine the [state's witnesses]." *State v. Traylor*, 656 N.W.2d 885, 899 (Minn. 2003). Two employees from the crime lab handled the evidence. Both testified as to how they handled the evidence; both were thoroughly cross-examined as to the practices and procedures, or lack thereof, at the crime lab. Hill had meaningful review and cross-examination of how the crime lab handled the evidence. He was not denied due process.

### *Sufficiency of evidence*

Finally, Hill argues that the evidence was insufficient to support his conviction. In reviewing a claim of insufficient evidence, we apply the same standard to a jury trial or a bench trial. *State v. Hughes*, 355 N.W.2d 500, 502 (Minn. App. 1984), *review denied* (Minn. Jan. 2, 1985). We review the record to determine whether the evidence, when viewed in the light most favorable to the verdict, is sufficient to allow the fact-finder to reach the verdict that it did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). We will not disturb the verdict if the fact-finder, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004).

Hill's conviction was based on circumstantial evidence, which is entitled to the same weight as direct evidence and will permit a conclusion that the conviction was supported by the evidence. *See State v. Whittaker*, 568 N.W.2d 440, 452-53 (Minn. 1997). This court takes a two-step-analysis approach in evaluating whether

circumstantial evidence supports a conviction. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). First, we identify the circumstances proved. *Id.* In doing so, we defer "to the [fact-finder's] acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the [s]tate." *Id.* at 598-99 (quotation omitted). Second, we "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* at 599 (quotation omitted). "[W]he[n] the identification of the drug is in question, the sufficiency of the evidence is examined on a case-by-case basis." *State v. Olhausen*, 681 N.W.2d 21, 29 (Minn. 2004).

*Olhausen* provides circumstantial factors to consider when reaching a conclusion as to the nature of a substance: (1) whether the state had possession of the entire amount of the controlled substance for testing; (2) the findings of the district court; (3) the verdict below, recognizing that the fact-finder is in the best position to evaluate evidence surrounding a crime; (4) statements about the substance made by those involved in the sale; (5) whether the defendant fled the scene; and (6) whether there was evidence suggesting that the substance was something other than a controlled substance. *Id.* at 28-29. In the context of factors influencing probable cause, an additional consideration is whether drug paraphernalia was found with the substance. *State v. Knoch*, 781 N.W.2d 170, 179-80 (Minn. App. 2010), *review denied* (Minn. June 29, 2010).

To sustain the conviction, Hill must have sold more than ten grams of methamphetamine. Minn. Stat. § 152.021, subd. 1(1) (2008). To achieve the required weight, the state had to prove beyond a reasonable doubt that 9a and 9b were

9

methamphetamine, because, in the absence of either, no combination of the other bags could combine to a weight of ten grams or more. Hill states that no testimony was offered as to the GCMS results of 9b, and thus the contents have not been proven beyond a reasonable doubt.

Goldstrand was not asked, and did not testify, whether the GCMS test on 9b confirmed methamphetamine. But she testified that 9a and 9b combined to a total weight of 12.025 grams of methamphetamine. She also testified that, while preliminary testing is not conclusive, 9b returned a preliminary result positive for methamphetamine.

In addition to Goldstrand's testimony, the following evidence supports a conclusion that 9b contained methamphetamine: (1) the CI arranged to purchase methamphetamine and Hill responded; (2) the CI, after testifying that she was a methamphetamine user and had purchased the drug previously, testified that she "looked at [the bags given during the sale] to make sure . . . it looked like meth instead of an imitation drug"; (3) the CI testified that nothing indicated that the substance given to her was not methamphetamine; (4) NIK testing on 9b was positive for methamphetamine; (5) there is no evidence that Hill ever attempted to sell fake methamphetamine; (6) drug paraphernalia was recovered from the vehicle where the substance was sold; and (7) all other substances tested positive for methamphetamine according to the GCMS.

That the prosecutor failed to inquire as to the GCMS results of 9b is concerning. But, read in context, this seems to be simple oversight. The prosecutor asked about the weights and preliminary test results of all bags of substance; he asked about the GCMS results of all bags except 9b. When the time came in which his inquiry regarding the

GCMS testing results would follow in due course, he apparently jumped to questions about the total weight of bags 9a and 9b, instead of 9b alone. Likewise, he asked about the substance contained in both 9a and 9b, instead of asking about Goldstrand's conclusions as to the contents of 9b individually. Viewed in the light most favorable to the verdict, the circumstantial evidence supports Hill's conviction.

**Affirmed.**